**William Alvin SMITH,**
**Petitioner–Appellant,**
**Cross–Appellee,**

**v.**

**Walter ZANT, Warden, Georgia Diagnostic and Classification Center,**
**Respondent–Appellee, Cross–Appellant.**

**No. 88–8436.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 29, 1989.

Rehearing Denied Dec. 4, 1989.

Stephen H. Glickman, Auckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, D.C., Stephen B. Bright, Atlanta, Ga., for petitioner-appellant, cross-appellee.

Dennis R. Dunn, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee, cross-appellant.

Before RONEY, Chief Judge, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK, EDMONDSON, and COX, Circuit Judges.

BY THE COURT:

William Alvin Smith, a Georgia prisoner, was convicted of armed robbery and malice murder in connection with the robbery and killing of the owner of a grocery store and service station. Smith was sentenced to death for the offense of murder, and unsuccessfully appealed to the Georgia Supreme Court. *Smith v. State*, 249 Ga. 228, 290 S.E.2d 43, *cert. denied*, 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982). He was also denied post-conviction relief from the Georgia state courts. *Smith v. Francis*, 253 Ga. 782, 325 S.E.2d 362, *cert. denied*, 474 U.S. 925, 106 S.Ct. 260, 88 L.Ed.2d 266 (1985).

Smith then filed a petition for habeas corpus in the United States District Court for the Middle District of Georgia. The district court, based on essentially undisputed testimony about Smith's mental retardation, found that Smith did not knowingly and intelligently waive his *Miranda* rights. The court held that the introduction of Smith's confession was harmless error as to his conviction, but that it was not harmless as to his death sentence. Accordingly, the court granted Smith a writ of habeas corpus as to the death sentence, but denied Smith's petition as to the conviction. *Smith v. Kemp*, 664 F.Supp. 500 (M.D.Ga.1987). Smith appealed from the denial of habeas corpus as to his conviction, and the State cross-appealed from the grant of the writ as to Smith's sentence.

A panel of this Court dismissed the appeal for lack of jurisdiction. *Smith v. Kemp*, 849 F.2d 481 (11th Cir.1988). The parties then sought, and the district court granted, certification under Fed.R.Civ.P. 54(b). A panel of this court then heard the appeal and affirmed the district court's order to the extent that it granted the writ of habeas corpus as to Smith's sentence, but reversed the denial of the writ as to Smith's convictions. *Smith v. Zant*, 855 F.2d 712 (11th Cir.1988). The Court took this case in banc, which resulted in the

panel opinion being vacated. *Smith v. Zant*, 873 F.2d 253 (11th Cir.1989).

The judges of the in banc court are equally divided on the proper disposition of this case. Therefore, the order of the district court is AFFIRMED as a matter of law. *See Reshard v. Britt*, 839 F.2d 1499 (11th Cir.1988) (*in banc*); *Henderson v. Fort Worth Indep. School Dist.*, 584 F.2d 115 (5th Cir.1978) (in banc), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979).

TJOFLAT, Circuit Judge, specially concurring:

The equally divided en banc court today affirms the district court's judgment, *see ante*, by operation of law. *See Reshard v. Britt*, 839 F.2d 1499 (11th Cir.1988) (en banc); *Henderson v. Fort Worth Indep. School Dist.*, 584 F.2d 115 (5th Cir.1978) (en banc), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979).[1] On the merits, six judges would affirm the issuance of the writ of habeas corpus with respect to petitioner's death sentence but would reverse the district court's refusal to set aside petitioner's conviction. The other six judges, myself included, would affirm the district court's refusal to set aside petitioner's conviction but would reverse the district court's grant of the writ with respect to petitioner's death sentence.

I write separately because I am troubled by two aspects of the district court's disposition of this case: first, its decision on the merits of petitioner's claim that the trial judge erred in admitting his confession into evidence at trial; second, its certifying as final a judgment based on fewer than all of petitioner's numerous claims. In part I of this special concurrence, I review briefly the procedural history of the case. In part II, I demonstrate that the district court's grant of the writ was incorrect on the merits. Part III concerns the fallacy of resolving a habeas corpus case on the basis of a single claim, in the name of judicial

---

**1.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of

the former Fifth Circuit handed down prior to October 1, 1981.

economy, while leaving other claims unresolved.

### I.

Petitioner, William Alvin Smith, was convicted in the Superior Court of Oglethorpe County, Georgia, of armed robbery and malice murder and was sentenced to death for the latter offense. On direct appeal, the Georgia Supreme Court affirmed. *Smith v. State*, 249 Ga. 228, 290 S.E.2d 43, *cert. denied*, 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982). Petitioner unsuccessfully sought habeas corpus relief in the state courts. *Smith v. Francis*, 253 Ga. 782, 325 S.E.2d 362, *cert. denied*, 474 U.S. 925, 106 S.Ct. 260, 88 L.Ed.2d 266 (1985). He then filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Georgia, raising essentially the same claims as in the state habeas proceeding and seeking relief both from his conviction and from his death sentence. Petitioner alleged, *inter alia,* that he had received ineffective assistance of counsel and that the trial judge erred in admitting his confession into evidence at trial.

After an evidentiary hearing, the district court concluded that the confession should not have been admitted because petitioner was retarded and did not knowingly and intelligently waive his *Miranda* rights.[2] *Smith v. Kemp*, 664 F.Supp. 500 (M.D.Ga. 1987). The court granted the writ with respect to petitioner's sentence, finding that the confession might have played a role in the jury's decision to sentence petitioner to death. *Id.* at 506–07. The court denied petitioner relief from his conviction, however, holding that the admission of the confession was "harmless error" given the overwhelming evidence of guilt. *Id.* at 506.

The district court expressly based its decision on "one count contained in Petitioner's petition," stating that "[t]he ground on

which the court has decided to grant Smith's habeas [petition] concerns his waiver of rights under *Miranda v. Arizona.*" *Id.* at 501 (citation omitted). After the district court handed down its decision, the State requested the court to alter and amend its judgment and to address petitioner's remaining claims in the interest of judicial economy and finality. The district court declined, stating that determination of the remaining claims might never be required, so judicial economy would be better served by reserving decision until such time as necessary. The State then filed a notice of appeal from the district court's order granting the writ of habeas corpus. Petitioner cross-appealed from the district court's ruling that he was not entitled to relief with respect to his conviction. A panel of this court dismissed the appeal and cross-appeal for lack of jurisdiction. *Smith v. Kemp*, 849 F.2d 481, 483 (11th Cir.1988) (per curiam). Because the district court had not adjudicated all of petitioner's claims, its order was not a final judgment from which the parties could appeal as of right under 28 U.S.C. § 1291 (1982). Nor had the district court determined that there was no just reason for delay and directed entry of judgment, pursuant to Fed.R. Civ.P. 54(b),[3] on the single count it had decided. Finally, jurisdiction was unavailable on the basis of *Wilson v. Kemp*, 777 F.2d 621 (11th Cir.1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986), and *Blake v. Kemp*, 758 F.2d 523 (11th Cir.), *cert. denied*, 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985). In those cases, this court entertained appeals by the State because the district courts' dispositive orders granting the writs "gave the petitioner all [the relief] he could hope to achieve by the litigation." *Blake*, 758 F.2d at 525. By contrast, petitioner in the current case obtained relief only from his death sentence, whereas he sought relief

---

**2.** As the discussion in part II of this opinion makes clear, the district court did not state expressly that the trial judge erred but focused instead on the validity of the confession.

**3.** Fed.R.Civ.P. 54(b) provides: "When more than one claim for relief is present in an action, ...

the [district] court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

from both his sentence and his conviction. The district court did not resolve the remaining claims that challenged petitioner's conviction and that would, if resolved in his favor, afford him additional, and complete, relief. The panel therefore dismissed the appeal and cross-appeal, suggesting that the parties request the district court to make proper Rule 54(b) certification and direct entry of judgment on the "*Miranda* claim" in order to permit the appeals. *Smith,* 849 F.2d at 483–84.

At petitioner's request, the district court then amended its original order granting (and denying) the writ of habeas corpus. Pursuant to Rule 54(b), it expressly determined that there was no just reason for delay and ordered entry of final judgment granting petitioner habeas corpus relief (with respect to his sentence) on what it characterized as petitioner's "*Miranda* claim." Petitioner then appealed the district court's denial of relief with respect to his conviction, and the State cross-appealed from the grant of the writ with respect to petitioner's sentence. The same panel that refused to hear the prior attempted appeals then proceeded to consider the merits of these appeals.

## II.

In granting relief merely on the basis of its conclusion that petitioner's retardation

rendered him incapable of making a knowing and intelligent waiver of his *Miranda* rights [4] and that his confession was therefore invalid, the district court did not squarely confront the real issue: whether the *trial judge* committed *constitutional error* in admitting the confession into evidence.

### A.

In his petition for a writ of habeas corpus, Smith contended that his confession was invalid because he lacked the mental capacity to make a knowing and intelligent waiver of his right to remain silent and, if he spoke to the police, his right to have counsel present during the interrogation.[5] He brought this contention to the district court as an underlying element of two distinct constitutional claims.[6] First, and primarily, petitioner claimed that he received ineffective assistance of counsel because his attorney, after routinely moving to suppress petitioner's confession, failed to inform the judge about petitioner's retardation and thus to alert the judge to the possibility that petitioner did not knowingly and intelligently waive his rights to remain silent and to have counsel present during questioning.[7] As a result of the attorney's

---

**4.** *Miranda v. Arizona,* 384 U.S. 436, 467–72, 86 S.Ct. 1602, 1624–26, 16 L.Ed.2d 694 (1966) requires that before a person in police custody can be interrogated, he must be informed of his fifth amendment right to remain silent and also, for the purpose of protecting that fifth amendment right, of his rights to consult with counsel and to have counsel present during interrogation.

**5.** Petitioner also asserted that the waiver was involuntary. *See infra* notes 7 and 8. The overwhelming focus of his contention, however, was on the question of whether the waiver was knowing and intelligent, given his limited mental abilities.

**6.** Actually, since petitioner requested relief as to both his conviction and his sentence on the basis of each claim, the contention that he did not waive his *Miranda* rights was an underlying element of *four* claims: The first and second claims challenged the effectiveness of trial counsel with respect to petitioner's conviction and with respect to his death sentence; the third and fourth claims challenged the introduction

of his confession into evidence and its impact on both his conviction and his sentence.

Petitioner also claimed fifteen other violations of his constitutional rights affecting his sentence; two of these also affected his conviction. *See infra* note 27. The district court did not consider these claims. We do not consider them because all that the partial final judgment brings to us is petitioner's claim that the trial judge erred in admitting his confession. *See* Fed.R.Civ.P. 54(b) (quoted *supra* note 3).

**7.** Petitioner's claim, in relevant part, was as follows:

Petitioner's court-appointed attorney Keeble failed to render reasonably effective assistance to petitioner at virtually every stage before, during and after trial, with the result that his conviction and sentence of death were obtained and affirmed on appeal in violation of petitioner's right guaranteed by the Sixth ... and Fourteenth Amendments to the Constitution of the United States.

....

*Keeble's pro forma pretrial efforts to suppress petitioner's post-arrest confession while in po-*

failure, the judge had no evidence before him to suggest that petitioner's waiver was not valid and consequently denied petitioner's motion to suppress his confession.

According to petitioner, his counsel was ineffective in the following ways. Although counsel recognized that petitioner was of below-average intelligence, counsel failed to pursue the matter; routine investigation would have disclosed the extent of petitioner's retardation and would have raised doubt about his ability to make a knowing and intelligent waiver. Had counsel understood the extent of petitioner's retardation, counsel would have taken a more active role at the suppression hearing: counsel would have put petitioner on the witness stand to testify that when the police questioned him he did not understand the *Miranda* warnings the police had given him; counsel would have called addi-

tional witnesses to attest to petitioner's limited intelligence; and counsel would have cross-examined more effectively the two law enforcement officers who testified about the interrogation and petitioner's confession. As it was, counsel failed even to argue that petitioner had not given a knowing and intelligent waiver. In short, counsel simply did not bring the issue of petitioner's retardation and its effect on the validity of his waiver to the presiding judge's attention.

The second claim based on petitioner's contention that he lacked the mental capacity to make a knowing and intelligent waiver was that the trial judge should have discerned from the evidence before him that petitioner was retarded and could not have waived his *Miranda* rights; therefore, the trial judge erred in admitting petitioner's confession into evidence.[8]

lice custody were incompetent in each of the following respects:

a. *Keeble failed even to identify or argue the correct legal bases for challenging the introduction of the confession,* which were (i) that petitioner's waiver of his constitutional rights to remain silent and to have an appointed attorney present during any questioning was invalid because not given knowingly, voluntarily and intelligently; ...

b. *Keeble failed to investigate* the validity of petitioner's waiver of his constitutional rights; and

c. at the pretrial confession suppression hearing *Keeble failed to adduce and/or argue readily available evidence of petitioner's mental limitations and other facts which undermined the validity of petitioner's waiver,* including the following facts:

(i) petitioner, in a state of hunger and exhaustion when arrested late at night (Record at 88, 96), was taken immediately upon arrest to a jail in another county (Record at 89, 96) where he was held for twelve hours (Record at 90, 97), incommunicado and in a private cell, and then taken alone and placed in the custody of two officers who finally permitted him to eat and then interrogated him;

(ii) petitioner was mentally retarded and because of his mental limitations could not understand either the rights he was told about or the significance of his waiver of those rights;

(iii) petitioner's school records reveal that when he was last tested, as a ninth grader in March 1978, he only scored in the first percentile in reading (99 out of 100 did better than he did) and the second percentile in English (98 out of 100 did better than he did); and

(iv) A Psychological Evaluation of petitioner performed in 1974 to determine his intellectual functioning and his appropriate educational placement not only concluded that petitioner was 'within the mental defective range of intelligence,' but also stated in pertinent part as follows:

William's performance on the verbal subtests indicates poor memory for ideas, poor judgment and poor verbal comprehension when using facts obtained from his surrounding environment and overly concrete thinking limits.

William's performance on the vocabulary subtests was also low. His low performance on this subtest indicates poor familial cultural and educational background.

\* \* \* \* \* \*

William's weakest area was in verbal comprehension, and reasoning. These weaknesses indicate poor school achievement and low social awareness.

(Emphasis added.)

8. Petitioner did not expressly identify the second claim as one of trial judge error. I believe that the failure to do so, both by the parties and by the district court, has caused the mischief in this case. *See* discussion in text *infra.*

Petitioner's statement of the claim is as follows:

Petitioner's post-arrest confession was extracted from him by the police during custodial interrogation without a valid, knowing, voluntary and intelligent waiver of his rights to remain silent and to have counsel present, and was then *introduced against him at trial,* with the result that his conviction and sentence of death were obtained in violation of

After the State responded to Smith's petition, denying that counsel had been ineffective and that petitioner's waiver was invalid, the district court convened an evidentiary hearing on petitioner's ineffective assistance of counsel claim. Under the two-pronged approach to such a claim, *see* *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the court had to decide whether counsel's performance was deficient, and if so, whether the deficient performance prejudiced the defendant.

The court received evidence on both points.[9] Dr. Everett Kuglar, a board-certified psychiatrist, had examined petitioner before his arraignment, pursuant to court order, for the purpose of determining both his competency to stand trial and the viability of an insanity defense. In his report to the court, Dr. Kuglar had found petitioner competent to stand trial and had found nothing to suggest that petitioner was not sane at the time of the offense.[10] At the habeas hearing, Dr. Kuglar testified that

petitioner was in fact retarded. He opined that a person functioning at petitioner's level of intelligence would have difficulty understanding the nature of his *Miranda* rights and the consequences of waiving them unless those rights were slowly and painstakingly explained to him—an issue Dr. Kuglar had not been called upon to address during petitioner's criminal prosecution.[11] Dr. Kuglar also stated that he had not been consulted by petitioner's attorney prior to the suppression hearing, that he spent less than the usual amount of time discussing the case with defense counsel, and that they had never discussed the confession or the effect of petitioner's retardation on his waiver of *Miranda* rights.

Floyd Keeble, petitioner's trial attorney, testified as well. He stated that the motion to suppress, which asserted that petitioner's waiver was not knowing or intelligent, was a standard motion that he routinely filed, changing only the name of the accused. The motion had little to do with the specifics of petitioner's case.[12] More-

his rights guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.
(Emphasis added.)

9. The district court also had before it the record of the state habeas corpus proceeding at which petitioner had raised essentially the same claims as in his federal habeas corpus petition. That record contained, with respect to petitioner's ineffective assistance of counsel claim, a transcript of the evidentiary hearing, at which only petitioner's trial counsel and a state prison employee testified, and numerous affidavits: one from Dr. Everett Kuglar, a psychiatrist; one from Dr. Brad Fisher, a psychologist; two from public defenders; and many from petitioner's family and acquaintances. *See* discussion in text *infra*.

10. *See infra* note 20.

11. The testimony of Dr. Brad Fisher, a "correctional" clinical psychologist who examined petitioner only after his conviction, endorsed Dr. Kuglar's conclusions with respect to petitioner's retardation and its impact on his ability to make a knowing and intelligent waiver of rights.

12. Attorney Keeble filed the following motion, which he admitted contained factual inaccuracies regarding the specifics of petitioner's case:

MOTION TO SUPPRESS DEFENDANT'S
STATEMENTS

Now comes William Alvin Smith, Defendant in the above stated case, and moves this Court to suppress any and all statements made by him after his arrest to law enforcement officers. In support of his motion, William states:

1. He is charged with armed robbery and murder and has entered a plea of not guilty.

2. The State, by and through the District Attorney, will introduce into evidence at the trial, oral admissions, a written statement and/or tape recordings of a statement made by William Alvin Smith to law enforcement officers while in custody at the Oglethorpe County Jail.

3. Those statements which may incriminate William Alvin Smith were the result of persistent and repeated interrogations by numerous skillful law enforcement officers "in the absence of counsel and without an intelligent or knowing waiver of counsel."

Psychological ploys and fatigue combined during hours of questioning to overcome William Alvin Smith's will and rendered any admission involuntary and coerced in violation of the Fifth and Fourteenth Amendments to the United States Constitution. [Citations.]

WHEREFORE, William Alvin Smith prays for a hearing to determine the voluntariness of the statements in the totality of circumstance and to determine the validity of any waiver of counsel prior to the interrogations.

Because the issues of voluntariness and of the validity of waiver of counsel will be deter-

over, although the boilerplate motion asserted the invalidity of petitioner's waiver, the waiver issue was never argued before the trial judge. Keeble also stated that, prior to the hearing on the motion, he had received Dr. Kuglar's report concerning petitioner's competency to stand trial but had made no further investigation of petitioner's mental retardation, although by that time Keeble was planning to use petitioner's mental limitations in some way at trial. Keeble ventured that he might have objected more strenuously at the suppression hearing had he then known the full extent of petitioner's intellectual disability.[13]

Two affidavits from public defenders discussed the procedures to be followed by a defense attorney when representing a retarded client; one of the affidavits reviewed the specifics of Keeble's representation of petitioner and concluded that Keeble's performance was deficient. Finally, there were numerous affidavits of family members, co-workers, teachers, and acquaintances, many of whom stated that they knew petitioner to be "slow" but that they had never been asked to testify on his behalf.[14]

In its memorandum opinion granting the petition with respect to petitioner's death sentence but denying relief with respect to his conviction, the district court stated that "the ground on which the court has decided to grant Smith[ ] habeas [relief] concerns his waiver of rights under *Miranda v. Arizona.*" *Smith v. Kemp,* 664 F.Supp. 500, 501 (M.D.Ga.1987) (citation omitted), *app.*

*dismissed,* 849 F.2d 481 (11th Cir.1988). The court determined that petitioner did not make a knowing and intelligent waiver and that his confession was therefore invalid; this established the common element underlying petitioner's two constitutional claims: ineffective assistance of counsel and trial judge error. Inexplicably, however, the district court did not identify the particular *claim* upon which it based relief.

### B.

The introduction into evidence at a criminal trial of a confession obtained without a waiver of *Miranda* rights does not, standing alone, constitute constitutional error. To show a violation of the Constitution, a defendant must go one step further: he must demonstrate that the government did something wrong. Our constitutional jurisprudence recognizes government error, in these circumstances, in either of two situations. In the first, the trial judge errs by admitting the confession over the defendant's objection; if the judge admits a confession in the face of evidence that there was no valid waiver of defendant's fifth amendment right to remain silent and to have counsel present,[15] reversible error occurs, unless the error is harmless beyond a reasonable doubt. In the second situation, defense counsel, acting as the government, causes the admission into evidence of an invalid confession by failing to render effective assistance, as guaranteed by the sixth amendment,[16] in not providing the

---

mined on the basis of credibility of police officers as opposed to the credibility of the Defendant, a determination which is peculiarly within the province of the jury, Defendant further requests that a special jury be empaneled before trial to decide isolated questions of fact, to wit:

1) Did William Alvin Smith understand his right to counsel and did he make a knowing and intelligent waiver before making a statement?

2) Were the statements induced by threats or promises?

> Respectfully submitted,
> /s *Floyd W. Keeble, Jr.*
> FLOYD W. KEEBLE, Jr.
> Attorney for Defendant

**13.** Much of this testimony was in fact presented at the evidentiary hearing held in the state habe-

as corpus proceeding, the transcript of which was before the district court. *See supra* note 9.

**14.** *See supra* note 9.

**15.** The fifth amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." This provision is made applicable to the states through the due process clause of the fourteenth amendment.

**16.** The sixth amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." This provision is made applicable to the states through the due process clause of the fourteenth amendment.

trial judge with a basis for concluding that the defendant did not validly waive his *Miranda* rights.

In this case, the petitioner, as I have noted, claimed constitutional error on both grounds—counsel error and trial judge error. The district court appears to have sidestepped the first claim: despite the considerable evidence pointing to counsel's deficient performance, it never addressed the question of whether counsel's performance was satisfactory. Thus, the district court must have decided the second claim. It did so, however, not on the basis of the evidence presented to the trial judge but rather on the basis of evidence presented to it five years later in a habeas corpus proceeding. As I will explain, the district court acted contrary to established precedent.

In resolving a claim of trial court error, we look not to evidence disclosed and developed in later state or federal collateral proceedings—evidence for which the trial judge cannot conceivably be held accountable—but to the record that was before the trial judge at the time of the challenged action. Many of this court's decisions in analogous contexts expressly recognize this principle. For example, when reviewing a defendant's claim that the denial of his request for a court-appointed psychiatrist to evaluate his competence to stand trial deprived him of due process of law, we stated: "[I]n determining whether a trial court has denied a defendant due process by refusing to obtain a psychiatric evaluation, we must 'focus on what the trial court did in light of what it then knew....'" *Bowden v. Francis*, 733 F.2d 740, 747 (11th Cir.1984) (quoting *Hance v. Zant*, 696 F.2d 940, 948 (11th Cir.) (Johnson, J.), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983)), *vacated*, 470 U.S. 1079, 105 S.Ct. 1834, 85 L.Ed.2d 135, *aff'd on remand*, 767 F.2d 761 (11th Cir.1985); *see Stephens v. Kemp*, 846 F.2d 642, 646–47 (11th Cir.) (Hill, J.) (following *Moore v. Kemp* in reviewing trial court's denial of indigent defendant's request for expert assistance), *cert. denied*, —— U.S. ——, 109

S.Ct. 189, 102 L.Ed.2d 158 (1988); *Moore v. Kemp*, 809 F.2d 702, 710 (11th Cir.1987) (en banc) (Tjoflat, J.) ("Specifically, we must assess the reasonableness of the trial judge's action [in denying an indigent defendant's request for an expert] at the time he took it"), *cert. denied*, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1988); *see also Smith v. Kelso*, 863 F.2d 1564, 1574 (11th Cir.1989) (Tjoflat, J., specially concurring) (whether trial judge's denial of a motion for severance produced an unfair trial is determined on the basis of what was before judge at the time, rather than from perspective of a "Monday morning quarterback").

Similarly, in deciding whether or not a trial judge has erred in admitting a confession, the reviewing court must examine the evidence upon which the judge based his ruling. In the current case, the information available to the trial judge included none of the evidence taken by the district court at its evidentiary hearing.[17] In his closing remarks at the federal evidentiary hearing, petitioner's habeas attorney conceded as much when he argued in support of the ineffective assistance of counsel claim:

> The trial court which initially held the confession suppression hearing and which made the initial determination of voluntariness—and I use the word "voluntariness" as a catch word which I will explain in a moment—did not have any evidence of mental retardation before it, did not have that evidence before it because [defense counsel] had not—had simply not prepared it—had not investigated it....

An examination of the record from the proper vantage point—that of the trial judge at the time he ruled to admit petitioner's confession—convinces me that no error occurred.

The record before the trial judge when he denied petitioner's suppression motion

---

17. Additionally, the district judge had the benefit of the evidence adduced at the state habeas proceeding with respect to petitioner's ineffective assistance of counsel claim. *See supra* notes 9 and 11.

reveals the following picture. Petitioner turned himself in to the Sheriff of Oglethorpe County on the night of June 8, 1981.[18] On June 10, the superior court judge who was eventually to preside at petitioner's trial appointed Keeble, the public defender, to represent petitioner. At a committal hearing before a magistrate, held three weeks after the appointment of counsel for the purpose of determining whether there was probable cause to hold petitioner and to seek grand jury indictment, defense counsel made no suggestion that petitioner might have been retarded. Moreover, the testimony of the Oglethorpe County sheriff, who was present at petitioner's arrest and who had known him for some time, did not raise any suspicion about petitioner's mental limitations.

After petitioner had been bound over to the grand jury but before indictment, the court held a pretrial proceeding pursuant to the Uniform Appeal Procedure ("UAP") established by Georgia law.[19] Following the prescribed procedure, the court conducted a colloquy with petitioner, whose replies were brief but responsive. The court then ran through the UAP checklist with both counsel. When it reached the routine topic of defendant's competency to stand trial, defense counsel stated merely that he would soon file a request for a psychiatric evaluation but gave no indication of any specific problem.[20] When the court came to the question of the admissibility of any confession or statements made by the defendant, defense counsel responded, "I understand a confession was made, Your Honor, but I don't know if any objection will be made at this time." Here again, the record contains nothing that should have suggested to the trial judge that petitioner might have been incapable of understanding his *Miranda* rights or of making a valid waiver.

Petitioner was arraigned on September 1, 1981. The court again conducted a colloquy with the defendant, who responded coherently, stating that he understood all of the court's questions, identifying the charges against him, and pleading "not guilty." The court also ran through the UAP pretrial checklist once more, "to make sure that we do not omit any of it." On this occasion, the court independently referred to the evaluating psychiatrist's conclusion that petitioner was competent to stand trial, and defense counsel himself stated that petitioner was competent.

The court then conducted a *Jackson—*

---

**18.** The sheriff read him his *Miranda* rights at that time but did not question him until noon the next day, after he had rested, eaten, and again heard the *Miranda* warnings.

**19.** To protect a defendant's rights, reduce the possibility of error, and eliminate superfluous issues, Georgia has established a Unified Appeal Procedure to be followed in every case in which the state intends to seek the death penalty. Ga. Code Ann. § 27–2538 app. (Harrison 1987). Specific procedures are prescribed for the pretrial stage, for the trial itself, and for sentencing. At the pretrial stage, the court must conduct a conference attended by the prosecuting attorney, defense counsel and the defendant. After certain required preliminary matters, including a colloquy with the defendant to determine whether he is satisfied with defense counsel, the court then reviews a prescribed "Checklist," which enumerates categories of possible error, with both counsel.

The pre-trial checklist contains nineteen main categories, each of which is divided into numerous subtopics, to be explored by the trial judge. It includes, in relevant part:

D. Confessions and Admissions

    1. Miranda Warnings
    Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694
    a) Applicability of Miranda
    b) Compliance with Miranda (where applicable)
    ....

J. Competency of Defendant
    1. Motion for mental examination
    2. Special plea of insanity
    ....
    3. General plea of insanity

**20.** The court signed an evaluation order two days later, requiring petitioner to submit to a psychiatric evaluation. Dr. Everett Kuglar, who prepared the evaluation report, concluded that petitioner was competent to stand trial and found no evidence suggesting diminished criminal responsibility for the offense. The report stated that, despite indications that petitioner was somewhat limited intellectually, "his intellect does not appear to be limited to such an extent that he would be unable to ... make reasonable and responsible decisions in most situations."

*Denno* hearing [21] on petitioner's motion to suppress the statement that he made to law enforcement officers following his arrest. The State called Gene Smith, Sheriff of Oglethorpe County and chief investigating officer of the case, who testified that he had read petitioner his *Miranda* rights at the time of the arrest. Sheriff Smith stated that he had known petitioner for seven or eight years and that he knew petitioner had attended school. He testified that at the time of the arrest, petitioner's speech was good, he appeared to understand the rights read to him, and he told the sheriff that he did not want an attorney. Petitioner showed signs of fatigue but did not appear to be "bothered" or "worried" or under the influence of any drug. Sheriff Smith recalled that, before questioning on the following day, *Miranda* rights were once again read to petitioner, who also read the statement of rights himself, stated that he understood his rights, and signed the statement. Petitioner then made an unprompted narrative confession, fully recounting events leading up to the offense as well as the offense itself. Petitioner listened as the statement was read back to him, read it over himself, and signed it, later appending a second signature to an added sentence. At no time did he request an attorney.

On cross-examination, defense counsel asked Sheriff Smith if he knew petitioner's age or educational background but immediately abandoned that line of questioning without relating it to petitioner's ability to understand his *Miranda* rights, i.e., to the validity of the waiver. Counsel focused instead on the conditions under which the interrogation was conducted and on any promises that might have been made.

The testimony on direct examination of Deputy Sheriff John Cartee, who had transcribed petitioner's statement, substantially paralleled Sheriff Smith's testimony. He confirmed that petitioner had listened to several readings of his *Miranda* rights before questioning began, had stated on each occasion that he understood them fully, and had read and signed the statement of rights himself. Deputy Cartee further confirmed that petitioner had at no time requested an attorney and that no threats or promises had been made. Moreover, Deputy Cartee testified that petitioner was "very alert." Defense counsel conducted no cross-examination of Deputy Cartee.

Petitioner did not testify at the hearing. Nor did his counsel present any other evidence that might have indicated that he had not understood or waived his *Miranda* rights.

The court denied petitioner's motion to suppress his statement to the police, finding "that the statement was freely and voluntarily made, with knowledge, et cetera." At this point, there was no evidence before the court suggesting that petitioner was not of normal intelligence. The record of the hearing indicated no abnormality: the trial judge had twice held colloquies with petitioner, who responded with apparent comprehension; the court-appointed psychiatrist had concluded that petitioner was competent to stand trial; [22] defense counsel stated that petitioner was competent; petitioner was known to have attended school and to be literate; petitioner's own statement was an unprompted narrative that revealed his ability to express himself cogently. [23] Furthermore, the State

21. In *Jackson v. Denno,* 378 U.S. 368, 376–77, 381, 84 S.Ct. 1774, 1780–81, 1783, 12 L.Ed.2d 908 (1964), the Supreme Court held that when a defendant challenges the admission of his confession on the ground that it was involuntary, due process of law requires a trial judge to determine that the confession is voluntary before allowing a jury to hear it. The hearing at which this determination is made has come to be known as a *Jackson–Denno* hearing.

22. Although petitioner's competency to stand trial did not establish his capacity to make a knowing and intelligent waiver, a positive as-

sessment of his competency sounded no alarm bells in the trial judge's mind, whereas a negative evaluation might well have done so. Furthermore, the psychiatrist's evaluation report indicated that petitioner appeared capable of making "reasonable and responsible decisions in most situations." *See supra* note 20.

23. While a trial judge cannot be expected to know facts developed only in later proceedings, subsequently taken evidence may shed light on what should have been apparent to the trial judge at the time. In this case, according to the

had produced two law enforcement officers who testified extensively on petitioner's alertness and responsiveness at the time he made the statement.

Trial counsel did not, either then or at any time during the trial, protest the trial judge's ruling admitting petitioner's confession into evidence. Nor did anything else occur that might have led the judge to suspect that petitioner's level of retardation prevented him from making a knowing and intelligent waiver of his Miranda rights.[24]

Given the limited evidence before the trial court at the time it denied petitioner's motion to suppress, I find its ruling entirely proper.

### C.

To conclude that the trial judge committed constitutional error in admitting petitioner's confession would have disastrous implications for any admission of a confession at a state or federal criminal trial, or indeed for any ruling with possible constitutional significance made by a trial judge, no matter how judicious and unassailable the ruling might have been at the time it was made. Such a holding would equate a trial judge's lack of knowledge of constitutionally significant facts—a lack of knowledge over which he generally has no control—with constitutional error whenever he rules adversely to the defendant on the basis of the facts before him and other, constitutionally significant facts are disclosed only in later proceedings. A habeas petitioner would no longer be required to demonstrate that the government did something wrong in order to show a constitutional "violation" entitling him to relief. Thus, whether or not counsel was ineffective in failing to uncover, investigate, or present important facts, and whether or not the trial judge's ruling would be considered proper on the basis of the information presented to him, a habeas petitioner could always attack any trial court ruling when new facts arose.[25]

All this is not to say that, in such a case as petitioner's, additional evidence of the type adduced at the later proceedings must be constitutionally irrelevant. Rather, it is to call for an examination of such evidence within its proper context: an ineffective assistance of counsel claim. The district court in this case quite properly took additional evidence of petitioner's retardation. It properly based its determination of the underlying issue of petitioner's lack of capacity to make a knowing and intelligent waiver on that evidence adduced in proceedings held subsequently to the trial. In holding that petitioner's retardation ren-

state habeas testimony of petitioner's trial counsel, even petitioner's own attorney, after several consultations with him, did not suspect for some time that his intelligence was significantly below average.

**24.** The Supreme Court has held that a trial judge has an obligation to conduct sua sponte a competency hearing "[w]here the evidence raises a 'bona fide doubt' as to defendant's competency to stand trial." Pate v. Robinson, 383 U.S. 375, 385–87, 86 S.Ct. 836, 842–43, 15 L.Ed.2d 815 (1966). Were this court to extend that obligation by analogy to the issue of invalid waiver of Miranda rights, I would still find no evidence giving cause for bona fide doubt as to petitioner's capacity to make a knowing and intelligent waiver in the record of what was before the trial judge.

Similarly, a panel of this court recently suggested that a judge presiding over a joint trial has a continuing duty to monitor the proceedings and sua sponte order severance in the event of undue prejudice to a defendant. Smith v.

Kelso, 863 F.2d 1564, 1569 n. 5 (11th Cir.1989). Were this court to extend that suggestion by analogy to the current case, I would still find no error. While evidence of petitioner's mild mental retardation was adduced at trial, there is no indication in the trial record that petitioner's incapacity to make a knowing and intelligent waiver ever became apparent in the course of the trial so as to trigger a need for the trial court to intervene on its own initiative.

**25.** Indeed, in the current case, the district court was asked to declare that the trial judge erred in admitting petitioner's confession into evidence even though petitioner himself had never stated that he did not understand his Miranda rights or the consequences of waiving them. The district court held that the trial judge erred in failing to suppress petitioner's confession because of his incapacity to waive his rights based on subsequently disclosed third-party, expert testimony that petitioner could not have understood and waived his Miranda rights unless they were slowly and carefully explained to him. See supra note 11 and accompanying text.

dered the confession invalid, however, the district court failed to identify adequately the constitutional violation, stating simply that it had "no other choice but to grant petitioner habeas corpus relief based on the lack of a 'knowing and intelligent' waiver." *Smith*, 664 F.Supp. at 504. The court did not explicitly relate its underlying determination to petitioner's constitutional claim of trial judge error, although the effect of its holding was to characterize the trial judge's ruling as erroneous. Nor, even after the extensive evidence received on the issue of ineffective assistance of counsel, did the district court deal explicitly with that claim. As demonstrated above, the additional evidence taken in subsequent habeas proceedings was relevant to the resolution of precisely that unaddressed issue and not at all to the issue of trial court error.

For the foregoing reasons, on the merits of this appeal, I would affirm the district court's denial of habeas corpus relief from petitioner's conviction, but not because the trial judge's error in admitting petitioner's confession into evidence was "harmless," as the district court concluded. Rather, I would affirm because, as I have shown, the trial judge simply committed no constitutional error. For the same reason, I would reverse the district court's grant of relief from petitioner's sentence.

### III.

In the name of judicial economy, the district court certified its judgment as final, pursuant to Rule 54(b), without addressing fifteen other claims raised by petitioner. Because I believe that serial disposition of a habeas corpus petitioner's claims undermines, rather than promotes, judicial economy in both the federal and the state courts,

I would require the district court to decide petitioner's other claims as well.

### A.

The final judgment rule generally dominates federal appellate practice. *See Di Bella v. United States*, 369 U.S. 121, 124–26, 82 S.Ct. 654, 656–57, 7 L.Ed.2d 614 (1962). This court carved out what I believe to be an exception to that rule in *Blake v. Kemp*, 758 F.2d 523, 524–25 (11th Cir.1985), by allowing the State to appeal from a district court order granting habeas relief on the basis of one of petitioner's several claims.[26] Rule 54(b), however, is not an exception to the rule; rather, it preserves the final judgment rule by establishing a procedure whereby a district court may certify as final a judgment from which an appeal may be taken although based on fewer than all claims in an action. *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437–38, 76 S.Ct. 895, 900–01, 100 L.Ed. 1297 (1956). This expediting procedure often promotes judicial economy and serves the interests of the parties by leading to a quick and final resolution of a dispute. *See Solomon v. Aetna Life Ins. Co.*, 782 F.2d 58, 60 (6th Cir.1986) ("[Rule 54(b)] attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties").

Unless Rule 54(b) certification is judiciously invoked, however, it can have precisely the opposite effect: parties dissatisfied with the results of the judgment and/or subsequent appeals will continue to press their unabandoned claims in the district court and to take appeals from judgments on those claims. To minimize this possibility, a district court making a Rule 54(b) certification must determine that there is no just cause for delay and that

---

**26.** I am on record as disagreeing with this court's position that a district court's judgment granting relief on the basis of some, but less than all, of a habeas petitioner's claims may be appealed by the State and reviewed by this court as a final judgment. *See Blake v. Kemp*, 758 F.2d 523, 535 (11th Cir.) (Tjoflat, J., dissenting), *cert. denied*, 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985). I continue to believe that such a holding undermines the final judgment

rule. It encourages disruption of state criminal justice systems, whereas federal policy as expressed in our rules and in our highest court's decisions is to minimize such disruption. *See, e.g.,* Rule 9(b), Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. § 2254 (1982) (discouraging successive and untimely habeas petitions); *Rose v. Lundy*, 455 U.S. 509, 520, 102 S.Ct. 1198, 1204, 71 L.Ed.2d 379 (1982).

certification is in the interest of "sound judicial administration." *Curtiss–Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 10, 100 S.Ct. 1460, 1466, 64 L.Ed.2d 1 (1980). The district court does so by making a case-specific assessment of the litigation as a whole and by "weighing ... factors relevant to the desirability of relaxing the usual prohibition against piecemeal appellate review." *Spiegel v. Trustees of Tufts College*, 843 F.2d 38, 43 (1st Cir.1988).

The decision to certify is within the "sound judicial discretion" of the district court. *Curtiss–Wright Corp.*, 446 U.S. at 10, 100 S.Ct. at 1466. The role of a reviewing court is not to "reweigh the equities or reassess the facts but to make sure that the conclusions derived from [the district court's] weighings and assessments are judicially sound and supported by the record." *Id.*, 100 S.Ct. at 1466. Thus, a court of appeals reviews the district court's certification decision with substantial deference and will reverse the district court only for abuse of discretion, provided the district court has considered relevant factors and articulated its reasons for certifying a judgment as final. *See Spiegel*, 843 F.2d at 43–44 (substantial deference if district court has fulfilled its responsibility of specifying the factors on the basis of which it granted certification); *Solomon*, 782 F.2d at 61 (standard of substantial deference assumes "that the district court undertook to weigh and examine the competing factors involved in the certificate decision" and set them forth so that a reviewing court can tell whether there has been an abuse of discretion); *Hayden v. McDonald*, 719 F.2d 266, 268–69 (8th Cir.1983) (same); *Arlinghaus v. Ritenour*, 543 F.2d 461, 464 (2d Cir.1976) (reasoned statement permits appellate court to review district court's exercise of discretion); *Allis–Chalmers Corp. v. Philadelphia Elec. Co.*, 521 F.2d 360, 364 (3d Cir.1975) (district court should clearly articulate reasons to give appellate court a basis for review). Although this court has not required the district courts to express their reasons "in every case," *In re Yarn Processing Patent Validity Litig.*, 680 F.2d 1338, 1340 (11th Cir.1982), courts of appeals have generally

urged that the district courts do more than cursorily track the language of Rule 54(b) itself, *see, e.g., Pension Benefit Guar. Corp. v. LTV Corp.*, 875 F.2d 1008, 1013 (2d Cir.1989); *Solomon*, 782 F.2d at 61; *Hayden*, 719 F.2d at 268–69; *Rothenberg v. Security Management Co.*, 617 F.2d 1149, 1150 (5th Cir.1980); *U.S. General, Inc. v. City of Joliet*, 598 F.2d 1050, 1051 n. 1 (7th Cir.1979); *Allis–Chalmers Corp.*, 521 F.2d at 364.

In the current case, the district court order certifying petitioner's *"Miranda* claim" stated merely the court's determination that "there [was] no just reason for delay." The order included no overall assessment of the impact of certification on the parties or on the courts. Because the district court has given us no reason to assume that it considered all relevant factors, substantial deference to the district court's decision is not mandated. I believe that this court should examine the question of whether certification was improvidently granted and should do so even though the parties have not challenged the order, since the question implicates the appellate jurisdiction of this court. *See Spiegel*, 843 F.2d at 43 ("because the issue implicates the scope of our appellate jurisdiction, we are duty bound to take it up *sua sponte* "); *Young v. Herring*, 777 F.2d 198, 201–02 (5th Cir.1985) (lack of proper Rule 54(b) certification is jurisdictional and appellate court may raise issue *sua sponte* ); *Allis–Chalmers Corp.*, 521 F.2d at 362–63 (appellate jurisdiction depends upon district court's properly granting Rule 54(b) certification).

In permitting certification of a judgment as final although based on only one of several claims, Rule 54(b) creates a tension between, on the one hand, the policy of avoiding piecemeal litigation and serial appeals, and, on the other, accommodating legitimate interests of the parties. *See Curtiss–Wright Corp.*, 446 U.S. at 8, 100 S.Ct. at 1465; *Solomon*, 782 F.2d at 61 n. 2. Consequently, certification should be granted only when it serves the interest of "sound judicial administration." *Curtiss–Wright Corp.*, 446 U.S. at 10, 100 S.Ct. at

1466. The particular situation before us, in which habeas corpus relief has been granted with respect to petitioner's sentence but denied with respect to his conviction, presents an exceptionally strong argument against the practice of deciding and granting relief based on only one of a litigant's claims. *See Thigpen v. Smith,* 792 F.2d 1507, 1513 (11th Cir.1986). In *Thigpen,* where a district court approved the parties' agreement first to litigate the constitutionality of petitioner's death sentence and to postpone all challenges to the underlying conviction, we described the practice as contrary to "strong policy considerations [which] have caused the Congress, in enacting the statute and rules governing habeas cases, and the courts, in formulating long-established principles, to require that all known and available grounds that could support a grant of habeas relief be brought and adjudicated in a single petition." *Id.* Had the district court in this case undertaken to examine the competing interests in this case, I do not see how it could have failed to see that not only does certification in this case threaten judicial economy, but, as I shall explain, it also frustrates legitimate interests of the parties.

### B.

Drawing on its finding that petitioner did not waive his *Miranda* rights, the district court in its memorandum opinion ordered the State to conduct anew the *sentencing* phase of petitioner's trial, while declining, in the interest of "judicial economy," to address other challenges to petitioner's *conviction.*[27] Presumably, the court's decision to grant Rule 54(b) certification on a single issue was also based on the concern for judicial economy. The district court's assumption that judicial economy would be served by such a practice, however, is not borne out in most of the scenarios that are likely to follow the district court's disposition of this case.

True, judicial economy might be served in the following situation: at the new sentencing trial conducted in state court, a life sentence might be imposed, and petitioner might decide to accept that sentence without returning to the district court to seek relief from his conviction by litigating the unadjudicated claims that challenge his conviction. He might accept a life sentence, for instance, if he fears that a second trial to determine his guilt would again result in a conviction for malice murder, thereby subjecting him once more to a possible death sentence in the sentencing phase that would follow. In such a situation, petitioner might request the district court to dismiss his outstanding habeas claims, and the litigation would end.

Even if petitioner fears reconviction for the offense of malice murder, however, he might not accept the life sentence and thereby end the matter. I am not at all certain that petitioner could not make an argument—sufficiently meritorious at least to require consideration by a court—that once a life sentence is imposed in the resentencing trial originally ordered by the district court, the state is thereafter precluded from seeking imposition of the death penalty after a new trial on the malice murder charge. See, for example, the debate between the majority and Justice Harlan, in *North Carolina v. Pearce,* on the issue of whether the double jeopardy clause of the fifth amendment protects a defendant, once sentenced, from later imposition of a harsher sentence following retrial. 395 U.S. 711, 749–50, 89 S.Ct. 2072, 2088, 23 L.Ed.2d 656 (1969) (Harlan, J., concurring in part and dissenting in part) ("[T]he defendant's choice to appeal an erroneous conviction is protected by the rule that he may not again be placed in jeopardy of suffering the greater punishment not imposed at the first trial."). If successful in such an argument, petitioner would then run no risk of a second death sentence even if reconvicted of malice murder and could litigate with

---

**27.** In addition to challenging his conviction through his ineffective assistance of counsel claim, petitioner challenged it on the grounds that he was not tried by a fair and impartial jury and that he was denied due process by the establishment of a conclusive presumption of one essential element of the offense of murder.

impunity the remaining habeas claims challenging his conviction.

In other scenarios, a habeas petitioner has obvious incentive to litigate his remaining claims, thereby prolonging the litigation. If petitioner is optimistic about a more favorable outcome were the guilt phase of his trial to be repeated, for example, he will almost assuredly press the remaining habeas claims challenging his conviction. Even if he has received a life sentence at the new state court sentencing trial, that sentence would still be based on his original conviction on the charge of malice murder. Conviction of a lesser-included offense would mean a correspondingly lesser sentence. And if a petitioner is dissatisfied with his new sentence, e.g., he receives a death sentence once again, he can certainly be expected to press the remaining habeas claims challenging his conviction.

Furthermore, if the court of appeals reverses the district court's grant of the writ based on less than all of the claims raised by a petitioner, the mischief is immediately apparent: the district court must consider petitioner's remaining claims on remand. Although *Blake*, also a habeas corpus case, involved a judicial exception to the final judgment rule rather than certification pursuant to Rule 54(b), the result of improvidently granting certification is the same:

> [T]he district court, on remand, will have to refamiliarize itself with the petitioner's claims, and it could repeat the process we have here. It could pick and choose among the petitioner's remaining claims and litigate those appearing to be most meritorious. If it found one justifying the issuance of the writ, it could, in an effort to conserve time and resources for example, leave the remainder for another day; hence, the tortuous cycle I have described could begin anew.

*Blake v. Kemp*, 758 F.2d at 543 (Tjoflat, J., dissenting) (footnote omitted).

Thus, whether the court of appeals reverses or affirms a district court's grant of relief from a habeas petitioner's sentence based on less than all of petitioner's claims, federal judicial economy is undermined. In the event of reversal and remand to the district court, the district court will spend additional time and effort re-examining claims of sentencing error that could have been disposed of in one proceeding. Even if the court of appeals affirms the grant of sentencing relief, as long as the petitioner remains without relief from his conviction, he will be back before the district court to litigate the undecided claims that challenge his conviction. Appeals will surely follow, taken either by petitioner or by the State. Such an outcome hardly comports with the concern for "sound judicial administration" that should underlie a district court's decision to certify as final a judgment based on fewer than all claims in a habeas petition.

When, as in this case, the district court orders the State to repeat the sentencing phase of the petitioner's trial, the district court imposes an even greater disruption and expense upon the state system. The State must impanel a new jury for the purpose of sentencing petitioner. It must make room on a trial calendar for the second sentencing proceeding, which will result in delay for other litigants. The state court must reacquaint itself with petitioner's case. Then, after all that, if petitioner successfully attacks his conviction, the new sentencing proceeding still based on that conviction will have been for naught. The wasted time, expense, and imposition on jury members, state trial judges, and parajudicial personnel could have been avoided had the district court considered the claim and granted relief as to petitioner's conviction in the first place. Needlessly forcing the State to conduct a futile proceeding is entirely inconsistent with our policy of respect for, and minimal disruption of, the state courts. *See, e.g., Engle v. Isaac*, 456 U.S. 107, 128, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982) ("[f]ederal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights"); *Rose v. Lundy*, 455 U.S. 509, 515–20, 102 S.Ct. 1198, 1201–04, 71 L.Ed.2d 379 (1982) (stressing importance of comity in context of requirement that claims be exhausted in state habeas proceedings before being raised in federal

court); *Galtieri v. Wainwright*, 582 F.2d 348, 356 (5th Cir.1978) (en banc) (exhaustion requirement serves policies of "comity, avoidance of piecemeal litigation, economy of judicial energy, and the fullest consideration of a petitioner's claims" and furthers "goal [of having] a petitioner travel through each system [state and federal] only once, at most, in his quest for vindication of alleged constitutional errors").

Moreover, considering not only the intrusion on the state court system but also the position of the State as a party to the litigation, the above discussion shows that the State's interests are in no way served by allowing appeal from a judgment based on fewer than all of petitioner's claims. The State, in trying a criminal defendant, has legitimate interests in deterrence and in punishment—interests that are undermined by serial disposition of habeas claims:

> Finality serves many [State] interests. Availability of unlimited federal collateral review to guilty defendants frustrates the State's legitimate interest in deterring crime, since the deterrent force of penal laws is diminished to the extent that persons contemplating criminal activity believe there is a possibility that they will escape punishment through repetitive collateral attacks.... Finality also serves the State's legitimate punitive interests. When a prisoner is freed on a successive petition, often many years after his crime, the State may be unable successfully to retry him. This result is unacceptable if the State must forgo conviction of a guilty defendant through the "erosion of memory" and "dispersion of witnesses" that occur with the passage of time that invariably attends collateral attack.

*Kuhlmann v. Wilson*, 477 U.S. 436, 452–53, 106 S.Ct. 2616, 2626–27, 91 L.Ed.2d 364 (1986) (citations and footnotes omitted) (citing *Isaac*, 456 U.S. at 127–28 n. 32, 102 S.Ct. at 1571–72 n. 32). The "tortuous cycle" described above—and invited in the

current case by certifying final judgment on only one of petitioner's claims—poses a real threat to, not an accommodation of, the State's interests.

Finally, granting Rule 54(b) certification in a habeas case is particularly inadvisable because of the possible preclusive effect of the partial final judgment. A habeas petitioner's claims are often interrelated and, as in the current case, may be based on one or more common elements. Frequently, before the district court can reach a judgment on any single claim, an element common to more than one claim must be litigated. Because a partial judgment certified as final under Rule 54(b) is no less final than any other final judgment, parties to the case are thereafter precluded from relitigating, as part of an unresolved claim, issues fully litigated and necessarily decided in the course of reaching the original partial judgment.

In the case at hand, for instance, the district court did not consider the preclusive effect of its partial final judgment on petitioner's ineffective assistance of counsel claim—to the extent that this claim is based on the alleged invalidity of petitioner's waiver of *Miranda* rights.[28] In his ineffective assistance of counsel claim, petitioner alleged that counsel's performance was deficient, i.e., that (1) counsel should have investigated his mental retardation and brought it to the attention of the trial judge, and (2) if counsel had done so, the trial judge would not have admitted petitioner's confession into evidence. He also alleged (3) that the confession's introduction into evidence *prejudiced* petitioner at both the guilt and sentencing phases of his trial. As previously indicated, the district court did not reach the question of counsel's deficient performance—the first inquiry when deciding ineffective assistance of counsel claims. *See Strickland*, 466 U.S. at 687–88, 104 S.Ct. at 2064. In holding that the introduction of the confession into evidence was harmless error with re-

---

**28.** Petitioner also claims that his counsel's performance was deficient in other respects. These bases for his ineffective assistance of counsel claim may, of course, still be asserted, because the district court did not determine whether petitioner was prejudiced, with respect either to his conviction or to his sentence, by the result of other alleged deficiencies.

spect to petitioner's conviction, however, the district court held, in effect, that petitioner was *not prejudiced* in the guilt phase by the confession's introduction. The determination of prejudice is the second step in deciding ineffective assistance of counsel claims. *See id.* The partial final judgment was based on another claim of error involving the introduction of the confession into evidence, i.e., trial judge error, but in holding that the introduction of the confession did not prejudice petitioner in the guilt phase of his trial, the district court has precluded petitioner from relitigating the prejudice issue—already decided against him—in the context of his ineffective assistance of counsel claim.

Conversely, the district court's holding that the introduction of petitioner's confession was prejudicial with respect to his sentence finally decides that issue in favor of petitioner and thus has preclusive effect against the State.

Moreover, a district court's decision to certify a partial judgment as final can affect the outcome of the case on appeal. Here, for example, the district court denied relief from petitioner's conviction, holding (1) that the introduction of his confession into evidence was error, but (2) that the error was harmless. The judges of this court who would affirm the district court's refusal to set aside the conviction might have different reasons for affirming: some might agree with the district court that the introduction of petitioner's confession was error but that it was harmless, i.e., it did not prejudice petitioner; others, such as myself, would affirm the denial of relief on the ground that the trial judge did not err and thus not reach the harmless error/prejudice issue.[29] But whatever the reasons of the judges for affirming the district court judgment, that judgment, once affirmed, stands as final, and the parties are precluded from relitigating the issues necessarily decided in the course of reaching it. The judges of this court who would hold only that the trial judge did not err—but whose affirmance on that ground

nonetheless establishes the judgment's preclusive effect on the prejudice issue—might not agree with the district court's finding that petitioner was not prejudiced by introduction of the confession. If the issue of prejudice had been properly presented in an appeal from a judgment based upon petitioner's ineffective assistance of counsel claim, they might have voted to reverse the denial of relief from petitioner's conviction. In the current situation, those judges who would hold that the trial court did not err would have to vacate the judgment below, on the ground that Rule 54(b) certification was improperly granted, in order to avoid its preclusive effect and to preserve petitioner's ineffective assistance of counsel claim for further litigation. If the district court had decided both the "trial judge error" claim and the ineffective assistance of counsel claim, the issue of prejudice would have been presented squarely to, and decided by, this court in one appellate proceeding. At the very least, therefore, a district court, in certifying a partial judgment in a habeas case as final, should be sure to reach all claims that contain elements in common with the one on which the judgment is based.

In today's disposition of the appeal, the equally divided court affirms the district court judgment simply by operation of law. The district court's ill-considered Rule 54(b) certification, actually invited by a panel of this court in *Smith*, 849 F.2d at 483–85, *see supra* at 4, has thus unwittingly barred, by operation of law, what might have been a meritorious ineffective assistance of counsel claim.

Because the district court's refusal to address all of petitioner's claims is likely to cause the problems discussed above, I believe that the district court improvidently granted Rule 54(b) certification in this case. As an alternative disposition on the merits, I would vacate that certification and the judgment entered thereon and direct the district court to litigate all of petitioner's claims.

---

**29.** I take no position on the issue of prejudice to petitioner, in either phase of his trial, resulting from the introduction of his confession into evidence. My sole concern is to set forth the undesirable consequences of a Rule 54(b) certification in a habeas case such as this.

FAY, Circuit Judge, specially concurring:

I concur in Parts I and II of Judge Tjoflat's special concurrence.

KRAVITCH, Circuit Judge, concurring in part and dissenting in part from the reinstatement of the District Court's opinion:

Applying long-settled law, we would affirm the district court's grant of the writ of habeas corpus on the ground that petitioner's waiver of *Miranda* rights was not "knowing and intelligent."

## I.

William Alvin Smith, a Georgia prisoner, was convicted of armed robbery and malice murder and was sentenced to death for the offense of murder. On the morning of June 8, 1981, Smith walked from his home in Lexington, Georgia to a grocery store and service station owned by Daniel Lee Turner, an 82-year-old man known to Smith as "Mr. Dan." Smith alone now knows what happened inside the store, but it is not disputed that within a few minutes after Smith entered the store, Turner was lying unconscious in a pool of blood, having been stabbed seventeen times and beaten with a hammer.

Immediately after the attack on Turner, Smith noticed that his friend Willie Robinson was standing outside the door to Turner's store. Robinson did not enter the store, but Smith went to the door, which was open, and told Robinson, "Damn, I think I killed Mr. Dan," or words to the same effect. Smith asked Robinson not to tell anyone about the killing, but Robinson immediately left to inform the police. Smith then went back inside Turner's store, removed Turner's wallet, took money from the cash register, and fled, carrying the hammer with which he had attacked Turner. Eyewitness testimony by John Collins, who had stopped with his coworker Rita Ridgeway to purchase gasoline from Turner, established that Smith ran across the highway on which Turner's store was located.

Turner died at 8:10 p.m. that evening. Later that night, after Smith's father had helped the police convince him to come out from the woods in which he was hiding, Smith surrendered and was taken to the jail in adjoining Clarke County. The police advised Smith of his constitutional rights upon his surrender but did not question him until the next morning, after Smith had eaten and had an opportunity for sleep. At no point, however, did Smith meet with members of his family, and he was detained in a different county from the one in which his family resided.

On the morning of June 9, Sheriff Gene Smith and Deputy Sheriff John Cartee again advised Smith of his constitutional rights. Smith declined consultation with an attorney and, after stating that he understood his constitutional rights, gave the following statement:

I, William Allen [sic] Smith, make the following statement. I left home and went to my aunts, Ruby Dorsey. I left my aunts and went to John Howard Woods. I left John Howard and started walking through Black Bottom toward Lexington to go to Mr. Dan's store. I asked for a pack of cigarettes and saw he was by his self. I then grabbed him. He started resisting me and I pulled knife out of back pocket and started stabbing him. He was still scuffling and he fall at back of store. He had a hammer. I kept stabbing him until he dropped hammer. I picked up hammer and hit him twice with it. I heard something come to door. I went to door and saw Willie Robinson and I told him I had killed Mr. Dan. I went back in store from front door and got money from cash register and out of Mr. Dan's pocket. I then ran back up Black Bottom. I took my shirt and wrapped it around my hand that was bleeding, and also the hammer. I threw them on side of road up the street as I was running. I make this statement voluntarily without threat or promise of my own free will.

This confession was written down by Cartee and signed by Smith. In response to further inquiry, Smith then made the following statement, which Cartee wrote on

the back of the confession: "The reason for my actions, I was trying to get money for another car."

A grand jury charged Smith with malice murder[1] and armed robbery.[2] Prior to trial, defense counsel requested a psychiatric evaluation of the defendant, and made a motion to suppress the confession on the grounds that it was not voluntarily, knowingly, and intelligently given. The psychiatric evaluation was performed by a state psychiatrist,[3] and although the competency hearing is not contained in the record transcript, the psychiatrist's report is in the record. The report indicates that the defendant is intellectually limited, and that he is capable of making "reasonable and responsible decisions in *most* situations." (emphasis added).

In the minutes before the state trial court conducted the *Jackson–Denno* hearing on the admissibility of Smith's confession, defense counsel objected to the Georgia Unified Appeal procedure during which the defendant is asked about the adequacy of his representation, his right to plead not guilty, his right to trial by jury, and his right to appeal. The objection was made on the ground that the defendant was "not competent to understand the multitudes of rights and procedures under the Unified Appeal, and that's only in my knowledge, and that he cannot waive those rights." (Tr. of Arraignment at 22).

Thereafter, Sheriff Smith and Deputy Cartee testified at the hearing to suppress the confession. After considering their testimony, the court concluded "that the statement was freely and voluntarily made, with knowledge, et cetera" and allowed its admission. Objection was preserved at trial when the state introduced the confession and a waiver of rights form signed by petitioner. (Trial Tr. at 222). Also before trial, defense counsel alerted the trial judge that some form of a diminished capacity defense would be offered.

At trial, testimony was presented that Smith's I.Q. placed him in classes for the educable mentally retarded. His mental age was calculated at between 10 and 12.2 years. Smith took the stand on his own behalf and admitted that he was "slow on learning. Some of the things, I didn't ... the words and stuff I didn't know." (Trial tr. at 289). He gave an account of the occurrences inside Turner's store. Although Smith's testimony is difficult to follow on a cold record, it is certain that he admitted stabbing and beating Turner. Smith's testimony differed in significant details, however, from the confession given to Sheriff Smith and Deputy Cartee. According to Smith's testimony, he asked Turner for a pack of cigarettes. Turner turned around to reach for the cigarettes and Smith touched him on the shoulder for an unexplained reason. As Smith touched Turner, he noticed that Turner had a hammer in his hand, but Smith "[didn't] know where the hammer come from, off the counter or from where, you know." Smith testified that Turner "grabbed that hammer, you know, he started forcing his self, you know, and I got carried away.... All I know, I was stabbing. That's all.... [H]e started to the back and then he fell, and when he fell, the hammer, it fell, too, and I guess I picked the hammer up and hit him with it." Smith denied that he had intended to rob Turner when he entered the store and testified that he took Turner's wallet and the money in the cash register after encountering Willie Robinson.

Defense counsel then asked Smith whether he had any other statement to make to the jury. Smith replied, "Yes. I didn't mean to kill Mr. Dan and I ain't had nothing against Mr. Dan or nothing, and I'm sorry I did it." Smith further said that Turner had always been friendly to him and his family, and that he had frequently been in Turner's store but had never before stolen anything.

The jury found Smith guilty of both charges, implicitly rejecting his defenses of

---

1. *See* O.C.G.A. § 16–5–1(a).

2. *See* O.C.G.A. § 16–8–41(a).

3. This was prior to *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), and no provision was made for an independent psychiatric examination.

insanity and lack of intent to kill. After hearing further testimony at the sentencing phase of the trial, the jury accepted the state's contention that the murder of Turner was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," *see* O.C.G.A. § 17–10–30(b)(7), and imposed the death sentence.

Smith unsuccessfully appealed to the Georgia Supreme Court. *Smith v. State,* 249 Ga. 228, 290 S.E.2d 43, *cert. denied,* 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982). He also attempted, without success, to secure post-conviction relief from the Georgia state courts. *Smith v. Francis,* 325 S.E.2d 362 (Ga.), *cert. denied,* 474 U.S. 925, 106 S.Ct. 260, 88 L.Ed.2d 266 (1985). Smith then filed a petition for habeas corpus in the United States District Court for the Middle District of Georgia. His petition alleged numerous grounds for relief from both his conviction and his sentence of death, including ineffective assistance of counsel, denial of an impartial jury, and improper introduction of his confession in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The district court held an evidentiary hearing on Smith's mental state during the period of the crime and immediately thereafter. Smith presented the testimony of Dr. Everett Kuglar, a board certified psychiatrist, and Dr. Brad Fisher, a clinical correctional psychologist, both of whom had examined Smith. The state introduced the testimony of Dr. Marcelo DeLaserna, an expert in psychological testing, who had neither met nor tested Smith. The testimony by Smith's experts tended to establish that Smith was mentally retarded and under severe stress during the pertinent period, and that Smith could not have waived his *Miranda* rights knowingly or intelligently if the nature of the rights and the consequences of waiver had not been slowly and carefully explained to him. The state's expert did not expressly disagree with this conclusion.

The district court issued a memorandum opinion granting Smith habeas relief. *Smith v. Kemp,* 664 F.Supp. 500 (M.D.Ga. 1987). Based on the essentially undisputed testimony regarding Smith's mental retardation, the court found as a fact that Smith had not knowingly and intelligently waived his *Miranda* rights. Given this factual finding, the court held that Smith had not validly waived his *Miranda* rights when he gave a confession to Sheriff Smith and Deputy Cartee. The district court further concluded that the introduction of Smith's confession was harmless error as to his conviction because "[t]he evidence in support of Smith's conviction for murder and armed robbery [is] overwhelming." *Id.* at 506. The district court did not believe, however, that the confession was harmless as to Smith's sentence of death, noting that when Smith took the stand at his trial, "[his] testimony ... was substantially more sympathetic than was the matter-of-fact written confession on the violent acts he had committed." *Id.* The district court therefore granted the writ of habeas corpus as to the death sentence, subject to the state's conducting a new sentencing hearing.

Because Smith did not abandon his other grounds for relief, the state asked the district court to reach the remaining claims. The district court declined to do so, citing considerations of judicial economy. Subsequently, the district court expeditiously granted certification under Fed.R.Civ.P. 54(b) that there was no just reason for delay and that final judgment should be entered on the *Miranda* claim.[4]   Smith

---

4. Before obtaining certification from the district court, the state sought appellate review of the district court's order granting habeas corpus based on the *Miranda* claim, and Smith cross-appealed from the district court's conclusion that the *Miranda* violation was harmless as to his conviction. Neither party, however, had requested that the district court expressly determine that there was no just reason for delay

and direct the entry of a final judgment on the *Miranda* claim. *Cf.* Fed.R.Civ.P. 54(b). In the absence of such a determination and direction by the district court, any order adjudicating fewer than all the claims of the parties in a suit is not a final judgment appealable as of right under 28 U.S.C. § 1291. *See In re Yarn Processing Patent Validity Litigation,* 680 F.2d 1338, 1339 (11th Cir.1982) (per curiam). This

filed a notice of appeal from the district court's denial of habeas corpus as to the conviction, and the state cross-appealed from the grant of the writ as to the sentence.[5]

## II.

The only claim on which the district court directed the entry of final judgment, and thus the only claim presented for consideration by this court, is the validity *vel non* of Smith's waiver of his *Miranda* rights. As a panel of this court recently emphasized, the validity of a suspect's waiver of his *Miranda* rights is an issue distinct from the voluntariness of a confession. *See Miller v. Dugger*, 838 F.2d 1530 (11th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988). The district court correctly understood this distinction. *See Smith v. Kemp*, 664 F.Supp. at 504.

In its petition for rehearing in banc, however, the state argued that *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), effectively did away with the "knowing and intelligent" requirement for a valid waiver of *Miranda* rights. The state subsequently abandoned this position, and conceded before this court in its in banc brief that a valid waiver of *Miranda* rights must be "knowing and intelligent." Nevertheless, we will take this opportunity to examine the current state of the law regarding waiver of *Miranda* rights.

### A.

We begin with what has been until this appeal an unexceptionable statement of the law. A defendant may waive his *Miranda* rights, but must do so "voluntarily, knowingly and intelligently." *Miranda*, 384

U.S. at 475, 86 S.Ct. at 1628. Thus, a court considering the waiver of *Miranda* rights conducts a two-pronged inquiry. As Justice O'Connor made clear in *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140–41, 89 L.Ed.2d 410 (1986):

Echoing the standard first articulated in *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), *Miranda* holds that "(t)he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S., at 444, 475, 86 S.Ct., at 1612, 1628. The inquiry has two distinct dimensions. *Edwards v. Arizona*, supra, 451 U.S., [477] at 482, 101 S.Ct., [1880] at 1883 [68 L.Ed.2d 378 (1981)]; *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979). *See also North Carolina v. Butler*, 441 U.S. 369, 374–375, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979).

The two dimensions of the waiver inquiry reflect two different concerns. "[T]he vol-

court accordingly concluded that it lacked jurisdiction over the appeal and cross-appeal. *Smith v. Kemp*, 849 F.2d 481 (11th Cir.1988) (per curiam).

5. Smith is thus appellant and cross-appellee in this second appeal, and the state is now appellee and cross-appellant. To avoid confusion with the first, abortive appeal, in which the parties' positions were reversed, we shall refer to Smith as "Smith" or "petitioner" and to the state solely as "the state."

Following the procedure adopted in *In re Yarn Processing Patent Validity Litigation*, 680 F.2d at 1340, Smith moved that the appeals be decided on the record, briefs, and oral argument submitted to the panel in the parties' prior attempted appeal. *See Smith v. Kemp*, 849 F.2d at 483–84. This motion was granted. A prior panel of this court affirmed the district court in part and reversed in part. 855 F.2d 712 (1988). We determined to hear this case in banc, and vacated the panel opinion.

untariness determination ... is designed to determine the presence of police coercion." *Connelly*, 107 S.Ct. at 522. By ensuring that a waiver is uncoerced, and thus voluntary, courts " 'deter[ ] lawless conduct by police and prosecution.' " *Id.* at 523 (quoting *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). On the other hand, the "knowing and intelligent" requirement flows from the fifth amendment guarantee itself. Because of the primacy of the fifth amendment right against self-incrimination, and because of the unique circumstances of custodial interrogation, the Constitution requires that the police take the reasonable step of ensuring that the suspect understands his basic fifth amendment rights and the consequences of his decision to waive those rights.

Courts are ill-equipped to discourse on the inner workings of the mind; nevertheless, it may be helpful in keeping the two prongs of the waiver inquiry distinct to note the difference between motivation and comprehension. The "voluntariness" inquiry is concerned solely with the defendant's motive in waiving his *Miranda* rights. The "knowing and intelligent" inquiry, on the other hand, does not look to the defendant's motive, nor does it consider *post hoc* the efficacy of the waiver; instead, the "knowing and intelligent" inquiry focuses solely on whether the suspect understands what he is doing.

### B.

We turn now to the state's short-lived theory that *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), eliminated the requirement that a waiver of *Miranda* rights be "knowing and intelligent."

In *Connelly*, the defendant argued that his confession was not voluntary because the "voice of God" told him to confess. 107 S.Ct. at 519. The Colorado courts suppressed Connelly's confession on the grounds that his confession was involuntary, and thus its use against him would violate the fourteenth amendment right to due process, and also because his waiver of *Miranda* rights was involuntary and therefore invalid, rendering his confession inadmissible. *Id.* Connelly never claimed that action of the state had coerced him into giving the confession; instead, the only "external" factor that motivated Connelly to confess was the voice of God.

The Supreme Court reversed. In an opinion by Chief Justice Rehnquist, the Court held that some coercion on the part of government authorities—coercion that is in some way the cause of the confession—was a necessary predicate for a finding that a confession was not voluntary for the purposes of fourteenth amendment due process concerns.[6] "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." 107 S.Ct. at 520. Because the police had in no way coerced Connelly in confessing, the Court reversed the Colorado court's determination that the use of Connelly's confession would violate the due process guarantee of the fourteenth amendment.

Having clarified the fourteenth amendment due process voluntariness inquiry, the Court also addressed the separate question of validity of Connelly's waiver of his *Miranda* rights.[7] The Court observed that

**6.** The Court did not specify what level or type of coercion was necessary to establish that a confession was involuntary, nor need we do so here. The Court did recognize, however, that coercion takes many subtle forms, and its effect can turn in part upon the particular mental condition of the defendant.

Respondent correctly notes that as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the "voluntariness" calculus. But this fact does not justify a conclusion that a defendant's mental condition, by

itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness."
107 S.Ct. at 520.

**7.** Before the fifth amendment protections were held to apply to the states, a separate line of cases evolved holding that the due process requirement of the fourteenth amendment barred the state from using involuntary confessions in criminal prosecutions. Now that it is clear that the fifth amendment protection against compelled self-incrimination applies to the states, *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12

"[t]here is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context," *id.*, 107 S.Ct. at 523, and applied the rule developed in its fourteenth amendment analysis to the *Miranda* waiver issue. Thus, because there had been no coercion on the part of the police, the Court reversed the Colorado court's conclusion that Connelly's waiver of his *Miranda* rights was not voluntary.

At first blush it appears that all *Connelly* addressed was voluntariness, both in the context of fourteenth amendment due process and *Miranda* waiver; and indeed, upon closer examination that initial impression is borne out. The *Connelly* Court addressed only "voluntariness." The Court did not even touch upon the separate requirement that a waiver of *Miranda* rights must also be "knowing and intelligent" because that issue was not before it—Connelly conceded that he understood his rights and the consequences of his decision to waive them.

Yet even if it were proper for this court to try to "read between the lines" of *Connelly*, we find no indication that the Court even hinted that the requirement that a waiver of *Miranda* rights be knowing and intelligent was no longer valid. Indeed, *Connelly* relies upon *Moran*, the opinion from the Court's prior term that so clearly and unequivocally acknowledged the distinctiveness and continued vitality of the "knowing and intelligent" requirement. Indeed, the *Moran* and *Connelly* majorities were composed of the same justices.

In *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1986), a case decided some six weeks after *Connelly*, the Court again reaffirmed that a waiver of *Miranda* rights must be knowing and intelligent. Writing for the majority—the same majority as that of *Moran* and *Connelly*—Justice Powell framed the discussion of

*Miranda* waiver in terms of the two distinct dimensions that Justice O'Connor had so clearly articulated in *Moran*. Although it may seem to belabor the point, Justice Powell's language is so direct and unequivocal that it merits our careful attention:

Consistent with this purpose, a suspect may waive his Fifth Amendment privilege, "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612.

. . . . .

In this case there is no allegation that Spring failed to understand the basic privilege guaranteed by the Fifth Amendment. Nor is there any allegation that he misunderstood the consequences of speaking freely to the law enforcement officials. In sum, we think that the trial court was indisputably correct in finding that Spring's waiver was made knowingly and intelligently within the meaning of *Miranda*.

*Id.*, 107 S.Ct. at 857–58. Thus, *Spring* puts an end to any speculation that the *Connelly* Court cast any doubt on the "knowing and intelligent" requirement.

The Court has also acknowledged the "knowing and intelligent" requirement in *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) and *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

This brief discussion of recent Supreme Court precedent leaves no doubt that a waiver of *Miranda* rights must be voluntary, as that term is defined in *Connelly*, and must also be "knowing and intelligent." It is now apparent why the state, upon due reflection, abandoned its argument that *Connelly* did away with the "knowing and intelligent" requirement. As an intermediate court we remain bound by the clear and unequivocal precedent holding that a waiver of *Miranda* rights must be knowing and intelligent.[8]

---

L.Ed.2d 653 (1964), courts are left with two voluntariness analyses: the pre-*Malloy* case law regarding fourteenth amendment due process and the fifth amendment *Miranda* waiver.

8. Judge Tjoflat's central premise in his opinion is that governmental wrongdoing, in addition to invalid waiver, is required to establish constitutional error where a confession is introduced without a knowing, uncoerced, and intelligent waiver of fifth and sixth amendment rights.

## C.

It may be helpful to pause for a moment and consider briefly the "knowing and intelligent" requirement itself. Again, we return to Justice O'Connor's opinion in *Moran*. Discussing the "knowing and intelligent" requirement, Justice O'Connor observed that "the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 106 S.Ct. at 1141. Thus, as we mentioned earlier, the rule that a waiver must be "knowing and intelligent" does not mean that it was a wise or intelligent choice; rather, the waiver must be made with an understanding of what is being waived. As *Connelly* makes clear, absent police coercion, courts will not inquire into the defendant's motive for waiving his rights, but, as *Moran* and *Spring* show, the Constitution does require that the defendant know what he is waiving and the consequences of his decision. Indeed, that is the very reason behind the *Miranda* decision itself. *Miranda* ensures that a defendant knows of his rights, and of the consequences of his decision to waive them.

Having made that observation, one further caveat is in order. A defendant need not understand all the complexities of his fifth amendment rights and of the implications of a decision to waive those rights. Rather, the defendant must understand only the core of the fifth amendment guarantee. Justice Powell's opinion in *Spring* is clear and needs no further gloss:

> The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver

of the Fifth Amendment privilege. *Moran v. Burbine*, ... 475 U.S. at ——, 106 S.Ct., at ——; *Oregon v. Elstad*, ... [470 U.S. 298] at 316–317, 105 S.Ct., [1285] at 1298 [84 L.Ed.2d 222 (1985)]. The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.

*Spring*, 107 S.Ct. at 857–58. In determining whether a waiver of rights is valid, therefore, a court need only inquire into whether the defendant understood that he had a right "not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time" and that "whatever he chooses to say may be used as evidence against him." The court does not concern itself with whether the defendant's decision to waive his rights was the "better" choice.

## III.

The state urges that the district court erred in failing to accord the state courts' factual conclusions a presumption of correctness, as required by 28 U.S.C.

---

The defendant, asserts Judge Tjoflat, has the burden to "go one step further" than showing that there was no valid waiver: "he must demonstrate that the government did something wrong." Governmental error, he writes, may take one of two forms: the judge may err by admitting the confession, over objection, "in the face of evidence that there was no valid waiver of defendant's fifth amendment right to remain silent and to have counsel present"; or "defense counsel, *acting as the government,* causes the admission into evidence of an invalid confession by failing to render effective assistance ... in not providing the trial judge with a basis for concluding that the defendant did not validly

waive his *Miranda* rights." (emphasis supplied).

In our view Judge Tjoflat is wrong in requiring a showing of governmental misconduct in the context of knowing and intelligent waiver, and in placing the burden upon the defendant to show that the waiver was invalid. Judge Tjoflat is driven far afield by his initial claim that the government must do something wrong as a necessary predicate for constitutional error. When, in a criminal justice system founded on adversary process, *defense* counsel is characterized as "acting as the government," the analysis must be subjected to careful scrutiny.

§ 2254(d).[9] We agree with the district court that the presumption of correctness is inapplicable to the central issues in this case. Of course, the ultimate question of the validity of a suspect's waiver of his *Miranda* rights is " 'a legal question requiring an independent federal determination,' " *Lindsey v. Smith,* 820 F.2d 1137, 1150 (11th Cir.1987) (quoting *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985)), not an issue of fact on which a presumption of correctness would apply to a determination by a state court. *Cf.* 28 U.S.C. § 2254(d). Nevertheless, we believe that the district court was also correct in concluding that on the occasions where the state courts had the opportunity to make factual findings regarding Smith's mental retardation and his waiver of *Miranda* rights, they failed to do so.

Despite the fact that Smith had put the state on notice that he was claiming the confession was not knowingly and intelligently given, the state trial court that heard Smith's suppression motion made no factual findings about Smith's retardation or its effect on his capacity to waive his rights, nor were material facts regarding Smith's retardation developed during the hearing.[10] The state trial court made no factual findings on the issue of Smith's knowing and intelligent waiver sufficient to merit the section 2254(d) presumption of correctness. *See Townsend v. Sain,* 372 U.S. 293, 313–14, 83 S.Ct. 745, 757–58, 9 L.Ed.2d 770 (1963) (state court must actually reach and decide issues of fact for presumption of correctness to apply).

Although Smith's retardation was an issue at his state habeas proceeding, the state habeas court's order reveals that the court conflated the issues of voluntariness and knowing waiver and failed to focus sufficiently on the separate issue of Smith's ability to make an intelligent waiver. In addition, the state habeas judge relied on evidence as to the defendant's competency to stand trial: to understand the charges against him, assist in his defense, and understand the consequences of an adjudication of guilt. Those characteristics of competency, however, are distinct from the mental acumen necessary to understand one's rights and to comprehend the ramifications of waiving them. The state habeas court also appears to have interpreted controlling Georgia cases to hold that the mere existence of a defendant's mental limitations, "without more," does not render the defendant incapable of waiving constitutional rights. *See, e.g. Donaldson v. State,* 249 Ga. 186, 289 S.E.2d 242, 245 (1982); *Parker v. State,* 161 Ga.App. 478, 288 S.E.2d 297, 298 (1982). If the state habeas court extracted from these cases a constitutional rule that proof of a defendant's mental limitations would always be legally insufficient to establish the invalidity of a waiver, the rule is inconsistent with the flexible approach required by *Johnson v. Zerbst,* 304 U.S. at 468, 58 S.Ct. at 1024.[11]

Thus, after reviewing the proceedings before the state habeas court, we conclude that "it is unclear whether the state finder

---

**9.** The state has not argued that any procedural bar prevents Smith from raising this claim. Smith's failure to appeal the issue of his knowing and intelligent waiver directly does not bar him from doing so collaterally. *See* O.C.G.A. § 9–14–42(b) ("Except for objections relating to the composition of a grand or trial jury, rights conferred or secured by the Constitution of the United States shall not be deemed to have been waived unless it is shown that there was an intentional relinquishment or abandonment of a known right or privilege, which was done voluntarily, knowingly, and intelligently.").

**10.** Although the evidence before the trial judge as to Smith's retardation was far from complete when the confession was admitted over objection, there was evidence in the record tending to show Smith's mental limitations, which would have impaired an effective waiver of *Miranda* rights.

**11.** We have previously given great weight to a defendant's mental retardation in concluding that his waiver of constitutional rights was invalid. *See, e.g., Cooper v. Griffin,* 455 F.2d 1142, 1145 (5th Cir.1972) (binding precedent under *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (in banc)). *But cf. Dunkins v. Thigpen,* 854 F.2d 394, 398–99 (11th Cir.1988) (mental retardation did not invalidate defendant's waiver of *Miranda* rights, in light of testimony that defendant had no difficulty communicating with counsel and psychiatric report concluding that defendant had adequate judgment, insight, memory, and attention span).

applied correct constitutional standards in disposing of the claim.... Since the decision of the state trier of fact may rest upon an error of law rather than an adverse determination of the facts, a hearing [was] compelled to ascertain the facts." *Townsend v. Sain*, 372 U.S. at 314, 83 S.Ct. at 757–58. We therefore affirm the district court's conclusion that the state courts had not made specific factual findings as to whether Smith's waiver of his *Miranda* rights had been "knowing and intelligent."

As we noted above, the district court held an evidentiary hearing to determine whether Smith's waiver was "knowing and intelligent." The state chose not to challenge any of the expert testimony regarding Smith's mental retardation. Instead, the state's sole expert witness, who had never examined Smith, disagreed with the experts who testified on Smith's behalf only on certain generalized issues. In light of the essentially uncontradicted evidence regarding Smith's specific mental retardation, the district court's findings are not clearly erroneous.[12]

Dr. Kuglar testified that Smith had a mental age of 10 or 11 and an intelligence quotient (IQ) of approximately 65, placing Smith in the bottom two percent of the population. According to Kuglar,

[T]his individual's intellectual limitations seriously question whether this man understood the consequences of confessing and whether or not he understood what his rights are. In our work with this man, you had to be very slow and patient in describing things to him. It certainly appeared to me both from my evaluation of him and his testing that he understood what he was doing was confessing, but I don't believe the man had an intellectual appreciation of what this confession would mean to him, nor do I think most people with an IQ in this range would have an appreciation unless it was very

carefully explained to him. What I can't comment on, because I wasn't there, is how carefully it was explained to him, how slow they went with this, but unless this was done very patiently and slowly, I don't believe he has the intellectual capacity to understand what it would mean to him.

Under questioning from the district court, Kuglar repeated his conclusion that "it would be very unusual with a person of this IQ to be able to intelligently appreciate what he is doing when his Miranda rights are read to him." Kuglar further testified that Smith had low verbal abilities and would have had difficulty understanding the language of the *Miranda* warnings. Moreover, although Kuglar did not believe that Smith would have confessed to committing an act that he had not done, Kuglar did think that Smith was sufficiently suggestible that "it would be fairly easy to moderate this man in the lines of exactly what you might want him to say if it was in the general area of what had occurred."

Kuglar's conclusions were confirmed by Dr. Fisher. Fisher reported that when he conducted psychological tests on Smith, "you had to repeat everything and give the questions to him extremely slowly." Fisher was unable to complete a Minnesota Multiphasic Personality Inventory test of Smith because Smith did not have the sixth- to eighth-grade reading ability necessary to take the test. Fisher believed that "you have to go about giving [Smith] the information in that [*Miranda*] waiver much more carefully; in other words, he comes in with a deficit of understanding so that you have to overcompensate through a careful explanation of all the terms and reading it slowly and other things that will compensate for that handicap." Fisher agreed with Kuglar that Smith was seriously deficient in verbal skills, and he confirmed that, because Smith was suggestible and would do what he perceived an authori-

12. In federal district court habeas, the state did not argue that the evidence before the trial judge comprised the entire record for review of the decision on the waiver issue, but rather presented expert witnesses. In its first post-hearing brief, the state canvass the evidence on the defendant's mental capabilities as they related to knowing and intelligent waiver, and *includes* the evidence presented in the state habeas proceedings in an attempt to bolster their claim. In the state's second post-hearing brief, the state relies on *Connelly* to argue that the only issue is voluntariness and the absence of police coercion.

ty figure would want him to do, "you have to be doubly careful to make sure that he's really understanding [the *Miranda* waiver] and not just showing his dependent characteristic to an authority figure in a stressful situation."

The state does not dispute the general proposition that a suspect's mental limitations can interfere with his capacity to make an intelligent waiver of the *Miranda* rights. At oral argument before this court, the state volunteered that in some instances the mental capacity of a suspect may be so limited as to require the police "to go the extra step" to insure that the suspect understands his rights. The state merely posits that Smith does not fall into this category. Yet the state points to no fact suggesting that it was clearly erroneous for the district court to find that Smith was so mentally retarded as to require slow and careful instruction of his rights.

The state argues that "the Petitioner's own experts testified that the Petitioner was fully capable of understanding the *Miranda* warnings if they were given in a fashion recommended by the Petitioner's witnesses. . . . Neither of the witnesses who testified for the Petitioner before the district court [was] present either when the Petitioner actually gave the statement or when the trial court, judging the credibility of the witnesses, held the *Jackson–Denno*[13] hearing. . . . Neither could say for a fact that the *Miranda* warnings were given in a manner which the Petitioner could not understand."

The state's argument is flawed in three respects. First, Smith's experts did *not* state that Smith would be "fully capable of understanding the *Miranda* warnings" if they were explained slowly. They testified to the inverse of that proposition, that Smith would not be capable of understanding the warnings if they were *not* explained slowly. The state's conclusion does not necessarily follow from the experts' testimony. Although the experts rejected the notion that a mentally retarded suspect would never be able to make an intelligent waiver of rights, they did not give their assurance that Smith himself would have been "fully capable" of validly waiving the *Miranda* rights even under ideal circumstances.[14]

Second, Dr. Fisher's testimony arguably implied that, given the stressful situation in which Smith found himself, Smith could not have waived his rights intelligently even if the rights had been explained to him carefully. After Fisher explained the phenomenon of "shock response," which mentally retarded persons commonly experience when they encounter stress, the district court asked, "[D]o you feel that [Smith] was retarded to such a degree that he could not intelligently waive his right to counsel, etcetera?" Fisher replied, "Right. If I did testify to that, I would like to take it back, because what I mean to say, *my belief is that with excessive stress he could not.*" Fisher believed that Smith was under severe stress from the loss of his girlfriend and his car even before he killed Turner, and that Smith's stress, "confusion, disorientation, and need for direction" were exacerbated by his commission of the crime, his flight, and his incarceration overnight in another county without communication from his family.[15]

13. *See Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (when defendant challenges voluntariness of confession, due process requires that trial judge make independent determination that confession is voluntary before permitting it to be heard by the jury).

14. Dr. Fisher did testify that if the *Miranda* warnings "were read slowly and carefully *in a non-stressful situation,* yes, he could comprehend and willingly and knowingly—in other words, he had that ability." Fisher carefully limited his response to non-stressful situations, which, in his opinion, the post-arrest interrogation was not.

15. The state argues that we should disregard the testimony of Dr. Fisher because the state habeas court, which had Dr. Fisher's affidavit, implicitly made an adverse determination as to Dr. Fisher's credibility when it rejected Smith's *Miranda* claim. We disagree. Although the credibility of a witness is a factual determination to which federal courts must accord a presumption of correctness under 28 U.S.C. § 2254, the state habeas court's rejection of Smith's *Miranda* claim did not necessarily comprise a rejection of Fisher's credibility. Rather, the state court may have rejected Smith's claim because it applied an erroneous rule of law to Smith's claim. Furthermore, we fail to see how the state

Third, a fair reading of the record indicates that Sheriff Smith and Deputy Cartee did not explain the *Miranda* rights to petitioner slowly and carefully. At the *Jackson–Denno* hearing, Sheriff Smith testified, "We read his rights to him. We asked him did he understand them. He said he did, and he signed it...." Sheriff Smith also stated, "I believe the [petitioner] read [the rights form] his self. I asked him did he understand it and he said he did." Conspicuous by its absence, in our view, is any hint that Sheriff Smith and Deputy Cartee were "doubly careful" in ensuring that petitioner understood his rights, particularly as Sheriff Smith testified that the entire process of securing Smith's waiver and obtaining his confession took "not over thirty minutes at the longest." [16]

The state also argues that Smith previously had been charged with burglary and forgery by Sheriff Smith and thus had experience with the criminal justice system sufficient to apprise him of the meaning of the *Miranda* warnings. The state thus seeks to distinguish this case from *Cooper v. Griffin*, 455 F.2d 1142 (5th Cir.1972), which involved two retarded teenage boys without prior experience with the criminal process. We agree with the state that prior experience with criminal justice may be relevant in determining whether a waiver of constitutional rights is valid, *see Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979), but we find no evidence on the record to convince us that the prior prosecution of Smith was particularly important in this case. The state offered no testimony to rebut the deeply pessimistic opinions of Smith's experts about Smith's capacity to understand and waive his rights. Indeed, when counsel for the state questioned Dr. Fisher on this issue, Dr. Fisher resisted the sugges-

tion that prior experience would be especially helpful to a retarded person's understanding of constitutional rights:

Q: In your experience, do you find that repeat offenders are more knowledgeable regarding, first of all, the trial system? Have you had any experience with that?

A: I have had some experience with that, and to some extent that's true; *to a much lesser, if any extent, with a person who is retarded, obviously*, but you didn't—you know, you didn't classify it to just retarded people, so for that whole group, yes, one learns from experience, so if they've been through the process before, they are more familiar with it.

Thus, after reviewing the record, we cannot say that the district court's factual findings regarding Smith's mental capacity are clearly erroneous. Given the district court's factual findings that because of Smith's mental retardation he could not understand his *Miranda* rights unless they had been slowly and carefully explained to him, and the finding that no such explanation was made, we would affirm the district court's conclusion that Smith's waiver of his *Miranda* rights was not valid because it was not "knowing and intelligent."

## IV.

We next consider whether the introduction of Smith's confession was harmless error as to Smith's conviction. "If, upon its reading of the trial record, the appellate court is firmly convinced that the evidence of guilt was so overwhelming that the trier of fact would have reached the same result without the tainted evidence, then there is insufficient prejudice to mandate the invalidation of the conviction." *Cape v. Francis*, 741 F.2d 1287, 1294–95 (11th Cir.1984),

habeas court could have made a decision on Fisher's credibility when Fisher never gave oral testimony. We previously have expressed doubts as to whether a credibility determination can be fairly made on a paper record. *See Agee v. White*, 809 F.2d 1487, 1494 n. 3 (11th Cir.1987).

16. Deputy Cartee's testimony at trial was to a similar effect: "He said he was willing to talk. In fact, Sheriff Smith asked him, I believe it was

twice, on two different occasions, did he want an attorney and he said no, he did not.... He was simply asked did he want to make a statement, and he gave us the full statement which was written down and he signed.... After the statement was complete, I first read it back to him. Then it was given to him to look over before he signed it.... He read it and said he understood it."

*cert. denied,* 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 245 (1985).

The district court found overwhelming evidence to support Smith's conviction for murder. The court noted that Smith confessed the killing to Willie Robinson and that Smith testified to the circumstances of the crime at trial. Certainly there was overwhelming evidence that Smith *killed* Turner; Smith never disputed this point. Smith was not charged with Turner's slaying, however, but with the offense of malice murder. The harmless-error analysis requires consideration of the elements of malice murder, the charges to the jury, and the possible existence of lesser included offenses, as well as the amount of proof adduced at trial.

Georgia defines the crime of malice murder as follows:

> (a) A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being.
>
> (b) Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart.

O.C.G.A. § 16–5–1. Several decisions of this court and the Georgia courts establish that intent to kill is an essential element of the crime of malice murder. *See, e.g., Lamb v. Jernigan,* 683 F.2d 1332, 1336–37 (11th Cir.1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983); *Mason v. Balkcom,* 669 F.2d 222, 224 (5th Cir. Unit B 1982), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983); [17] *Parks v. State,* 254 Ga. 403, 330 S.E.2d 686, 696 (1985); *Patterson v. State,* 239 Ga. 409, 238 S.E.2d 2, 8 (1977). The trial court in this case instructed the jury that intent to kill was a "necessary ingredient" to the crime of malice murder.[18]

Because Smith conceded that he committed the actual killing, *"the* essential element" of the crime was his intent to kill. *Cf. Brooks v. Kemp,* 762 F.2d 1383, 1393 (11th Cir.1985) (en banc), *vacated and remanded for further consideration,* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *reinstated on remand,* 809 F.2d 700 (11th Cir.) (en banc), *cert. denied,* 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 744 (1987); *Mason v. Balkcom,* 669 F.2d at 227. We must therefore focus on whether the erroneous admission of Smith's confession contributed to the jury's conclusion that Smith intended to kill Turner.

In cases involving burden-shifting instructions on the issue of intent to kill, we have stated that "a defense of accident or lack of intent not only places the element of intent in issue, but substantially reduces the extent to which evidence against the defendant can be considered to be 'overwhelming.'" *Carter v. Montgomery,* 769 F.2d 1537, 1541 (11th Cir.1985). Moreover, "[b]ecause confessions carry 'extreme probative weight,' the admission of an unlawfully obtained confession rarely is 'harmless error.' In fact, we have ruled the admission of an unlawful confession is harmless only in limited instances, such as where there was in evidence at least one other lawful confession by the defendant." *Christopher v. Florida,* 824 F.2d 836, 846

---

17. In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), this circuit adopted as binding precedent decisions issued by Unit B of the former Fifth Circuit after September 30, 1981.

18. A separate line of Georgia cases holds that malice murder may be proven by circumstances which demonstrate a reckless disregard for human life, *see, e.g., Flynn v. State,* 255 Ga. 415, 339 S.E.2d 259, 262 (1986); *Walden v. State,* 251 Ga. 505, 307 S.E.2d 474, 475–76 (1983), under the theory that "[a] wanton and reckless state of mind is sometimes the equivalent of a specific intent to kill," *Myrick v. State,* 34 S.E.2d 36, 39 (Ga.1945) and thus may satisfy the requirement of an "abandoned and malignant heart." 40 Am.Jur.2d *Homicide* § 51 (1968). The trial court did not instruct the jury on this theory of murder, but rather charged the jury that intent to kill was an essential element of malice murder. Nor did the trial court instruct the jury on the theory of felony murder. *Cf.* O.C.G.A. § 16–5–1(c).

(11th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988).[19]

In this case, the improper admission of Smith's confession might have made a considerable difference. Smith's confession to the police was the only "direct" evidence for the state that Smith intended to kill Turner. On the stand, Smith denied intending to kill Turner, and his trial testimony, if uncontradicted by the illegal confession, might have convinced the jury that Smith intended only to harm Turner. *Accord Owen v. Alabama*, 849 F.2d 536, 540 (11th Cir.1988) (illegally admitted confession not harmless error in Alabama murder conviction, as defendant's intent to kill was "poignantly evident only in his confession"); *cf. Mason v. Balkcom*, 669 F.2d at 227 (claim of self-defense does not implicitly concede intent to kill, because one can "shoot to wound in self-defense").

In addition, the account given by Turner at trial could well have supported a verdict on the lesser included offense of voluntary manslaughter rather than malice murder. Under Georgia law, "a person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." O.C.G.A. § 16–5–2(a). Smith testified that he saw Turner grabbing a hammer, or at least holding a hammer, after Smith touched Turner on the shoulder. Smith could well have believed

that Turner intended to hit him with the hammer. Even though Turner's back was turned to Smith at the time, Turner's apparent (to Smith) intent to use the hammer might have aroused "sudden passion in the person killing so that, rather than defending himself, he willfully kills the attacker, albeit without malice aforethought, when it was not necessary for him to do so in order to protect himself." *Syms v. State*, 175 Ga.App. 179, 332 S.E.2d 689, 690 (1985). "The fear of some danger can be sufficient provocation to excite the passion necessary for voluntary manslaughter." *Id.*

This case is similar to *Syms*, in which the victim pointed a gun at the defendant, thereby exciting a sudden passion in the defendant, but the defendant shot the victim when the victim glanced away, suggesting that the defendant was not justified in his use of force.[20] A case even closer to this is *White v. State*, 129 Ga.App. 353, 199 S.E.2d 624 (1973). In *White*, the victim quarreled with and threatened the defendant and "reached toward the back seat [of his car] for some unknown article, but was still sitting in his vehicle some yards away when the defendant, standing behind his son, suddenly caught up a shotgun and fired point blank at the deceased." *Id.*, 199 S.E.2d at 625. In both *Syms* and *White*, the Georgia Court of Appeals held that the trial court was correct to instruct the jury on the lesser included offense of voluntary manslaughter in addition to the crime of murder and found that the evidence supported a verdict of guilty for manslaughter.[21]

---

**19.** In *Christopher*, we noted that we have also ruled the unlawful admission of a confession to be harmless when there was *direct* physical evidence of guilt. 824 F.2d at 846 n. 24; *see, e.g., Harryman v. Estelle*, 616 F.2d 870, 876–78 (5th Cir.) (en banc) (unlawfully admitted confession that condom found on defendant's person contained heroin harmless in light of laboratory tests identifying substance), *cert. denied*, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980). Of course, this case is not like *Harryman*, for "'intent,' by its very nature, cannot be proven by direct evidence, unless the defendant expressly states his intent." *Brooks v. Kemp*, 762 F.2d at 1423 (Kravitch, J., concurring in part and dissenting in part).

**20.** Under Georgia law, a person is justified in using force against another only when he reasonably believes that such force is necessary to defend against the other's *imminent* use of unlawful force. *See* O.C.G.A. § 16–3–21. Under the facts of *Syms*, the defendant might not have been justified in believing that the victim's use of unlawful force was imminent.

**21.** The trial court did not instruct Smith's jury on voluntary manslaughter. Smith alleged in his petition for habeas corpus that this omission deprived him of due process, and that defense counsel was ineffective for failing to request such an instruction. *See Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). The district court did not address this claim.

We conclude that the admission of Smith's confession was not harmless as to his conviction for malice murder. Therefore, we would hold that Smith is entitled to relief from his conviction for armed robbery. Smith's confession provided the prosecution with damning evidence that Smith attacked Turner to obtain money for a new car. Smith's trial testimony tended to establish, however, that he did not form the intent to take money from Turner's wallet and cash register until the attack on Turner was completed. If the jury believed Smith's testimony, they could not have convicted him of armed robbery.

*Woods v. Linahan,* 648 F.2d 973 (5th Cir. Unit B June 1981), is instructive in this regard. In that case, Dessie Woods and Cheryl Todd were hitchhiking from Reidsville, Georgia to Atlanta when they accepted a ride from Ronnie Horne. Woods shot Horne while trying to fend off a sexual assault. After killing Horne, Woods reached into Horne's pocket and removed his wallet, containing $120, to finance the trip back to Atlanta. Woods was convicted of voluntary manslaughter and armed robbery. This court sustained Woods' conviction for manslaughter but held that the evidence was insufficient to support her conviction for armed robbery. We noted that under Georgia law, "a person commits armed robbery when, (1) with intent to commit theft, (2) he takes property of another from the person or the immediate presence of another, (3) by use of an offensive weapon." *Id.* at 978. We concluded that the record was devoid of evidence showing that the defendant "used the weapon or shot the victim *in order to rob him of his money.*" *Id.* (emphasis added).

To obtain a conviction for armed robbery in Georgia, the state must prove that the defendant used an offensive weapon in order to rob the victim of his money. A rational jury could have concluded, from circumstantial evidence including the state of Turner's store after the crime, that Smith attacked Turner "in order to rob him," but in light of Smith's testimony suggesting that the theft was an after-

thought, we do not find the evidence of Smith's guilt overwhelming so as to render the admission of the confession harmless.

## V.

The district court concluded that the introduction of Smith's confession was not harmless as to the sentence of death, noting that Smith's trial testimony was "substantially more sympathetic" than Smith's confession. The state does not dispute that the district court's conclusion is correct under the familiar "harmless error" analysis of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Rather, the state contends that we should apply the more stringent "reasonable probability of a different result" test employed for claims of ineffective assistance of counsel, *see Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984), or that we should not engage in harmless error analysis at all if we conclude that the evidence was sufficient to support the jury's finding of an aggravating circumstance.

The state's argument is without merit. Last term, the Supreme Court confirmed that the *Chapman* standard governs harmless error as to a sentence of death. The Court pointedly disavowed any implication that we should apply a "sufficiency of the evidence" standard instead: "The question ... is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988) (quoting *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828). We agree with the district court that the considerable difference between the tenor of Smith's confession and that of his trial testimony makes it impossible to conclude beyond a reasonable doubt that the improperly admitted confession did not influence the sentencing jury.

Judge Tjoflat raises persuasive arguments. The baton with which he races off, however, was dropped long ago by the state. The state has never in the entire course of the direct appeal or collateral proceedings raised the argument that Judge Tjoflat now takes up. The state selected its defenses and its arguments on appeal, and it must accept the ramifications of those choices. Waiver of claims is not a principle that works only to the detriment of petitioners. Here the state failed to argue that the trial judge, based on the evidence then before him, committed no error in admitting the confession. The state instead argued the presumption of correctness attaching to state findings and then *addressed* the merits of the psychiatric testimony which had not been before the state trial judge. Moreover, in the district court during federal habeas the state argued that the evidence *adduced at the district court hearing* was insufficient to show that the petitioner's confession was not knowingly and intelligently given.

Nor did the state during state habeas object to the introduction of psychiatric evidence on the grounds that the only proper record to be considered was that before the trial judge. Furthermore, in the state's post-hearing brief filed in the state habeas proceedings, the state continued to argue that the confession had been *voluntarily* given, and merely relied on the deputy's testimony that the defendant had appeared to understand his rights. The order issued by the state habeas judge asserts that the trial judge's finding of fact that Smith's waiver was "freely and voluntarily made" was supported by the record. The issue, however, is whether the waiver was made knowingly and intelligently.

No doubt Judge Tjoflat is pained at the state's failure to litigate a potentially advantageous claim, but this court should not second-guess the state's tactical and strategic decisions. The argument advanced by Judge Tjoflat may well have merit. It was not, however, briefed or argued before this court, apparently having been abandoned by the state. We need not and ought not resurrect it now.

We would affirm the district court to the extent that it granted the writ of habeas corpus as to Smith's sentence of death and reverse insofar as it denied the writ as to Smith's convictions.